**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID WOULARD, ATTACK THE SOUND LLC, an Illinois limited liability company, STAN BURJEK, JAMES BURJEK, BERK ERGOZ, HAMZA JILANI, MAATKARA WILSON, ARJUN SINGH, MAGNUS FIENNES, and MICHAEL MELL, each individually and on behalf of all others similarly situated, | ) | Case No. 1:25-cv-12613 |
| Plaintiffs, | ) | District Judge Sara L. Ellis |
| v. | ) | Magistrate Judge Jeannice W. Appenteng |
| UNCHARTED LABS, INC., d/b/a Udio.com. and UNKNOWN DEFENDANTS, | ) | **DEMAND FOR JURY TRIAL** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, David Woulard, Attack the Sound LLC, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, for their complaint against Defendant Uncharted Labs, Inc. ("Udio") and Unknown Defendants, allege as follows:

## NATURE OF THE CASE

1. This case challenges Udio's practice of systematically copying and storing works by independent artists to fuel a commercial, mass-market music-

generation engine. Udio built its rapidly expanding commercial empire by disregarding the intellectual property rights of the artists it claims to support. Udio created and sells a product that directly competes in markets where independent artists make their living, such as sync licensing, library and production music, streaming, commissions, and lyric licensing. Udio did not analyze or study various genres and styles, how songs in those genres and styles are harmonized and structured, the characteristic timbres of the instruments and vocalizations in those genres and styles, or anything else. To run this mass-market music generation engine, Udio copied and maintains a centralized library of essentially all music files of reasonable quality taken from online sources without permission, together with text descriptions, using these copies and descriptions to train and operate models that produce outputs replacing licensed music on a large scale.

2. Plaintiffs are independent musicians and songwriters whose livelihoods depend on licensing and recognition of their works. They have invested time, talent, and resources to create original music, only to see Udio wrongly appropriate and weaponize their work against them. Without the bargaining power of major labels, independent artists face particularly severe and unfair harm from Udio's conduct.

3. U.S. copyright law gives creators exclusive rights to control how their works are reproduced and used, including sound recordings and musical composition elements. These protections apply to recordings, lyrics, and non-lyrical expressions, such as melodic, harmonic, rhythmic, and arrangement

choices. These principles are essential for ensuring that creators are fairly paid for their work, which supports ongoing innovation and cultural development.

4. Udio has admitted to training its models on copyrighted material while claiming the ability to produce high quality songs that are indistinguishable from human performances. It did not seek permission or pay for the works it copied and retained. Udio hints at “fair use,” but copying and storing entire works to build a competing, profit-making music factory is not fair use.

5. Besides copying entire sound recordings, Udio also copied, tokenized, and indexed lyrics on a large scale. Udio extensively scraped lyric content from sources like Common Crawl, which includes databases such as Genius, AZLyrics, Lyrics.com, and Musixmatch, without securing the necessary licenses for lyric display or reproduction that are readily available in the market.

6. The claims in this case do not rely on whether outputs match a single work. Liability arises from Udio’s unauthorized reproduction, ingestion, and use of specific copyrighted recordings and compositions during pre-training, training, and fine-tuning, as well as from its collection and retention of a centralized library of pirated or otherwise unauthorized copies beyond any technical need. That non-transformative copying is illegal and not justified by fair use.

7. Udio’s commercial success and rapid technological growth directly come at the expense of independent artists. Given Udio’s swift expansion—

gaining millions of users—the harm to independent artists and small labels is immediate, widespread, and potentially irreversible. Udio actively diminishes the commercial value of original musical compositions and performances by flooding the music market with AI-generated tracks based on unauthorized use of copyrighted works. Its subscription-based business model profits significantly from this infringement, incentivizing users to create and monetize derivative works that directly compete with and displace original, human-created music.

8. Udio's misconduct extends beyond copyright issues. Udio collected, stored, and exploited biometric identifiers and voiceprints derived from human performances without adhering to the legal safeguards required by the Illinois Biometric Information Privacy Act (BIPA), thereby violating the Act. Udio also misused artists' voices and identities for commercial gain without permission, violating the Illinois Right of Publicity Act (IRPA).

9. Udio further violated the Digital Millennium Copyright Act by bypassing access controls to obtain works and by removing, altering, or providing false copyright-management information. These actions obstruct attribution, licensing, and enforcement efforts while concealing the origin of the works on a large scale.

10. Udio's conduct also constitutes contributory and vicarious infringement, deceptive trade practices, and unjust enrichment. Udio intentionally induced and materially contributed to downstream infringements by designing and marketing sound-alike capabilities while controlling its

service and reaping a direct financial benefit. Its marketing and positioning are likely to cause confusion regarding sponsorship, affiliation, or approval, and Udio has unjustly retained the value derived from artists' works.

11. No technological innovation, regardless of how transformative, can legally or ethically justify widespread infringement or the systematic violation of creators' rights. Udio must follow the same basic legal rules as all market players, especially respecting intellectual property rights that support the creative industries.

12. Unlike previous lawsuits filed by major music labels, which primarily aim to protect the high-value catalogs of popular artists, this case emphasizes the significant and unequal harm inflicted on independent musicians. Independent artists constitute the majority of music creators but lack comparable financial protections. They depend heavily on licensing revenue, royalties, and recognition of their creative works, and they face especially severe impacts from Udio's unauthorized use and market saturation.

13. Ultimately, this action serves as an essential test of whether technological progress can ethically and legally coexist with fundamental protections that foster human creativity. It emphasizes the need for accountability and a clear set of rules for the AI era.

## PARTIES

14. Plaintiff David "Davo Sounds" Woulard ("Woulard") is a military veteran, an active Chicago Firefighter, and a Chicago-based singer and

songwriter. Woulard co-owns or exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Woulard] (together, the “Woulard Works”). The Registered Recordings include, by way of example: “Bad News” (single), Reg. No. SR0000845765, registered March 25, 2019; and “Prequel to the Sound” (collection of seven songs), Reg. No. SRU001313672, registered March 28, 2018.

15. Woulard is the principal songwriter and lead vocalist for the Indie R&B band Attack the Sound and is a credited songwriter and copyright owner of the band’s releases.

16. Attack the Sound LLC (“ATS”) is an Illinois limited liability company. ATS manages and represents the artists, creative copywriters, masters, and performers who perform under the Attack the Sound name. Multiple Attack the Sound releases are registered with the U.S. Copyright Office as reflected in Exhibit A-[Woulard].

17. Since 2019, Attack the Sound has released ten singles and a six-track project, “Love Is War: Packed.” Its music is available on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

18. Woulard writes and records his vocal performances for Attack the Sound in Illinois.

19. Attack the Sound maintains a significant social-media presence, including over 15,000 Instagram followers, and actively promotes its releases in the competitive Chicago music market.

20. Plaintiffs Stan and James Burjek (together, the "Burjek Plaintiffs") are a Shorewood, Illinois-based father-and-son songwriting and recording duo. They've released folk rock and shoegaze music under the names "The Burjek Collective", "Smackin' Billies", and "Pool Deck Duel." Stan is a guitarist, songwriter, and vocalist; James is a multi-instrumentalist.

21. The Burjek Plaintiffs individually or collectively own, co-own, or exercise the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Burjek] (the "Burjek Works"). Registered sound recordings include, by way of example, "This Road" (album), Reg. No SRU001533131, registered February 8, 2023.

22. Since 2023, The Burjek Collective, Smackin' Billies and Pool Deck Duel have released multiple singles; the ten-song Smackin' Billies album "This Road" was released in May 2023. Stan is a credited songwriter and copyright owner of all material by The Burjek Collective, Smackin' Billies, and Pool Deck Duel. Their music is available on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

23. Stan recorded vocal parts for many of the songs, including specifically the following songs: This Road, Fire Years, What She's Thinking, Who Would You Be, Lights on our Faces, Dirty Them Dogs, Nothing With You, Rock Salt Hill, This Road Pt. 2 (Epilogue), Man on the Radio, Little Bales of

Hay, Perfectly Served. James recorded vocal parts on "How Can You See Love" released by Pool Deck Duel.

24. All The Burjek Collective, Smackin' Billies and Pool Deck Duel material was recorded at the Burjeks' home studio in Shorewood, Illinois.

25. Although neither Stan nor James is a full-time musician, their releases have garnered thousands of streams across platforms, and they actively work to expand exposure and streaming revenue.

26. Plaintiffs Berk Ergoz, Hamza Jilani, Maatkara Wilson, and Arjun Singh (collectively, the "Directrix Plaintiffs") perform as "Directrix", a Chicago-based band. A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by the Directrix Plaintiffs are identified in Exhibit A-[Directrix].

27. Directrix began as the passion project of Hamza and Berk nearly ten years ago in Dubai. After moving to Illinois to attend the University of Chicago, they joined with Wilson and Singh to write, record, perform, and release music.

28. In March 2023, Directrix released "The Whale Album," a collection of eight songs recorded in 2023. In July 2025, they released a five-song project, "Halotherapy." Both projects, along with the July 2023 single "(I Don't) Wanna Fall in Love", were recorded in Chicago, Illinois. Berk, Hamza, Maatkara, and Arjun are all listed as credited songwriters and copyright owners of this material.

29. Directrix distributes its music to major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, Pandora, and Tidal, through digital distributor EmuBands.

30. Members of Directrix recorded vocal parts across these releases, including: Buttermilk (main vocals: Plaintiff Maatkara, backing vocals: Plaintiff Hamza), The Breaching Song (main vocals: Plaintiff Maatkara, backing vocals: Plaintiffs Hamza, Berk, Maatkara), Hell's Breeze (main vocals: Plaintiff Hamza, backing vocals: Plaintiffs Maatkara, Hamza, Berk), Trick Mirror (main vocals: Plaintiff Maatkara, backing vocals: Plaintiffs Hamza, Maatkara), (I Don't) Wanna Fall in Love (main vocals: Plaintiff Maatkara, backing vocals: Plaintiff Hamza).

31. Berk, Hamza, Maatkara, and Arjun are all listed as credited songwriters and copyright owners of this material.

32. While not full-time musicians, the Directrix Plaintiffs have accrued thousands of Spotify streams (and more across other platforms) and earn a modest revenue stream from both streaming and live performances.

33. Plaintiff Magnus Fiennes is a Los Angeles-based, award-winning composer and producer whose work spans film, television, theatre, and video games. He has composed more than 240 hours of music, including the BBC's hit series "Death in Paradise," which he has scored for 15 seasons and continues to score, and its spin-off "Beyond Paradise," to which he has contributed 4 seasons, with work ongoing. His other notable credits include the

acclaimed dramas "Hustle," "Murphy's Law," and "The Last Enemy," as well as the feature film "Onegin" and the animated project "Casper's Scare School."

34. Fiennes' achievements include winning Best Music at the Reims International TV Awards for "Five Days" and composing music for hundreds of successful commercial campaigns for brands such as Coca-Cola, Ford, Kraft, and L'Oréal. He has also produced and written for major artists including Shakira, Tom Jones, Lenny Kravitz, Sinéad O'Connor, and the Spice Girls, contributing to hits such as the global number one "Never Ever" by All Saints.

35. Fiennes created and owns the music rights to "Freefonix," a children's animated series of 40 episodes (BBC Worldwide, 2007). All episodes are available on YouTube. The series features more than 80 songs co-written by Fiennes. Fiennes also composed the music and owns all music publishing and master recording rights for the feature films "Robots" (2024, NEON) and "Pervert's Guide to Ideology" (Zeigler Films, 2011).

36. A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Plaintiff Fiennes are identified in Exhibit A-[Fiennes]. Fiennes' registered recordings include, by way of example, "Let armies loose", Registration No. PAu002889490, registered August 20, 2004.

37. Fiennes releases music on major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, and Pandora.

38. Plaintiff Michael Mell, who records and produces music under the name "Mic Mell," is an Atlanta-based songwriter and producer who owns or

exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Mell] (the "Mell Works"). Mell is the principal songwriter and recording artist for all works released as Mic Mell.

39. Mell wrote and recorded the 12-song project "Muff-ucker" (2006) and the 13-song project "Low Blood Sugar" (2010). He has also released music as "Barcode Lounger" and "Funkanetics," including the 2006 Funkanetics single "All In A Day's Work Part I," and the 2006 Barcode Lounger album "Tech Support, Vol. 2 (Remastered) – EP." A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Mell are identified in Exhibit A-[Mell].

40. Mell's projects have been published to major streaming platforms, including Spotify, Apple Music, Amazon, Pandora, and Tidal.

41. Defendant Uncharted Labs, Inc. d/b/a Udio is a Delaware corporation with its principal place of business at 750 Lexington.Avenue, Floor 9, New York, New York 10022.

42. Unknown Defendants are individuals or entities who either directly infringed on Plaintiffs' federally copyrighted sound recordings or knowingly induced or materially contributed to Udio's infringement. These defendants knowingly helped, facilitated, or significantly contributed to Udio's infringement by collecting, scraping, copying, or acquiring copyrighted sound recordings for inclusion in Udio's AI training data. Additionally, these unknown defendants actively encouraged or supported Udio's infringing activities by providing vital

resources, tools, or assistance and/or directly supervised and financially benefited from Udio's unlawful conduct. Once the identities of these Unknown Defendants are discovered, Plaintiffs will amend this Complaint and serve notice on the identified persons or entities.

## JURISDICTION AND VENUE

43. This civil action seeks damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101 et seq., removal or alteration of copyright management information under the Digital Millennium Copyright Act, 17 U.S.C. § 1202, and other claims. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this action arises under federal law. Jurisdiction can also be found under the Class Action Fairness Act, 28 U.S.C. § 1332, because (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as Plaintiffs and Defendants are domiciled in different states; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

44. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and the Classes' state-law claims because they are so related to the federal claims (including the Copyright Act and DMCA claims) that they form part of the same case or controversy under Article III. The state-law claims do not raise novel or complex issues of state law, do not substantially predominate over the federal claims, and none of the

circumstances enumerated in § 1367(c) applies. Exercising supplemental jurisdiction promotes judicial economy, convenience, and fairness to the parties. Those state-law claims include, without limitation:

a. the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 et seq.;

b. the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 et seq; and

c. any other state-law claims asserted (e.g., unjust enrichment under Illinois law) arising from the same nucleus of operative facts, namely, Udio's acquisition, copying, ingestion, training, and commercialization of Plaintiffs' and Class members' recordings, lyrics, identities, and biometric identifiers/voiceprints.

45. This Court has specific personal jurisdiction over Defendant Udio because Udio has deliberately and continuously exploited the Illinois market and has purposefully directed suit-related conduct into Illinois and this District, and Plaintiffs' claims arise out of or relate to those Illinois contacts; exercising jurisdiction is consistent with due process, fair play, and substantial justice. Udio's Illinois- and District-related contacts include, without limitation:

(a1) Udio makes its generative AI music service and app to users throughout the United States, including Illinois, thereby expressly including Illinois users as part of its intended customer base. Authenticated users (who have Udio's free or paid plans) in the Chicago area and in this District, for example, access Udio's service and app at https://www.udio.com/ (IPV4

address at 76.76.21.21) by communicating directly with servers located in Chicago. There is no option to choose servers not based in Chicago – this is selected automatically by Udio's infrastructure architecture, routing most Illinois users to Illinois-based servers and other infrastructure;

(a2) Udio offers its service to Illinois residents through Udio's dedicated marketing website. Users in the Chicago area and in this District, for example, access Udio's marketing site at https://www.udio.com/ (IPV4 address at 76.76.21.21) by communicating directly with servers located in Chicago. There is no option to choose servers not based in Chicago – this is selected automatically by Udio's infrastructure architecture, routing most Illinois users to Illinois-based servers and other infrastructure;

(a3) Udio offers its service to Illinois residents through Udio's mobile application and maintains continuous access to Illinois users through that app. Users in the Chicago area and in this District, for example, access Udio's service, app, and marketing site at https://www.udio.com/ (IPV4 address at 76.76.21.21) by communicating directly with servers located in Chicago. There is no option to choose servers not based in Chicago – this is selected automatically by Udio's infrastructure architecture, routing most Illinois users to Illinois-based servers and other infrastructure;

(a4) Udio expanded platform access by launching a dedicated iOS mobile app that allow users, including Illinois users, to generate AI-created songs on consumer mobile phones and mobile devices located in Illinois;

(a5) Udio has offered, marketed, and provided its service to Illinois residents on a continuous basis since at least April 2024 (its public launch). Udio does not geoblock Illinois users and instead affirmatively invites and enables Illinois residents to create AI-generated music through its platform and integrations;

(a6) Udio's service is a highly interactive online platform that requires users to transmit requests (including prompts, edits, and other inputs) from user devices located in Illinois (including in this District) to Udio-controlled endpoints, and Udio then transmits AI-generated audio outputs and related content back to user devices located in Illinois;

(a7) Udio provides AI-generated music and vocal outputs "in seconds" in response to user prompts and interactive commands, requiring repeated, ongoing exchanges between Illinois users and Udio's systems;

(a8) Udio offers tiered subscription plans (including free and paid tiers) as part of its ordinary commercial operations, and Udio's paid tiers are offered on a recurring basis that forms ongoing commercial relationships with paying subscribers in Illinois and in this District;

(a9) Udio's paid tiers include subscription offerings priced at approximately $10/month and $30/month, and Udio accepts and processes payment for subscriptions, thereby entering repeated, ongoing commercial transactions with paying users, including users located in Illinois. These transactions originate from Illinois and are SSL-encrypted to ensure information is specifically targeting and safely transmitting data and

confirmations to and from the user's computer in Illinois. According to its publicly available and visible source code, Udio's website integrates multiple payment/subscription vendors (Stripe, Recurly, Braintree) and subscription retention/cancellation/dunning vendors (Churnkey, Baremetrics Dunning), reflecting a mature, recurring-revenue subscription business, not a one-off or incidental service. On information and belief, Udio's subscription onboarding necessarily captures billing address/state/ZIP (or equivalent location information for payment authorization/tax/compliance) and therefore Udio knows it is contracting with and collecting recurring subscription revenue from Illinois residents, including in this District;

(a10) Udio permits broader usage and commercialization of AI-generated outputs under paid tiers, including by allowing subscribers to generate substantially more outputs and to use outputs more extensively, thereby monetizing Illinois-based usage and commercial exploitation;

(a11) By registering for and using Udio, users—including Illinois users—assent to Udio's Terms of Service and related policies, forming contractual relationships under which Udio performs ongoing services for Illinois users;

(a12) Udio's platform operations necessarily involve allowing Illinois users to stream and/or download generated audio into Illinois as part of the service Udio sells and performs for Illinois customers;

(a13) Udio's platform stores user accounts, settings, generation history, libraries, and/or other persistent user content such that Illinois users

can repeatedly access their accounts and content from Illinois, reflecting a continuing course of Illinois-directed service performance;

(a14) Udio's platform permits users to upload audio files and/or other audio inputs (including audio containing human voices) as part of Udio's service features, and Udio receives, processes, stores, and uses those audio inputs, including when submitted by Illinois users from devices located in Illinois;

(a15) Udio encourages users to disseminate or share AI-generated outputs on third-party platforms (e.g., YouTube, TikTok, Spotify, Instagram Reels, and SoundCloud), resulting in outputs created using Udio in Illinois being distributed into Illinois and publicly disseminated from Illinois. Udio temporarily disabled the download feature in late 2025 but it was available to all users prior to then and was actively used by users in Illinois and in this District. Udio has stated that the pause in downloads is temporary;

(a16) Udio's business model is designed so the company profits more as users generate, share, and commercialize additional tracks; Illinois usage and Illinois output generation directly contribute to Udio's revenue and growth;

(a17) Udio's Illinois contacts are not "random" or "fortuitous." Udio knowingly makes its services available to Illinois residents, enters contractual relationships with Illinois users, and provides ongoing performance under those contracts to Illinois users;

(a18) Udio's subscription and account flows necessarily collect and process information sufficient to provision accounts and process payments and renewals, including billing or payment information that, on information and belief, identifies Illinois subscribers by address, ZIP code, and/or other location data;

(a19) By collecting billing/payment information and processing recurring payments, Udio knows it is doing business with Illinois residents and knowingly profits from Illinois commerce;

(a20) Udio's web and mobile services necessarily receive and process user device/session data (including, on information and belief, internet protocol (IP) addresses and related telemetry) whenever Illinois users access the service, and Udio uses such data in the ordinary course for authentication, security, abuse prevention, and service operation;

(a21) Udio uses standard web and app analytics/telemetry to measure usage, performance, and/or monetization by geography (including by state and metropolitan area), and therefore maintains internal metrics identifying its Illinois user base and Illinois usage;

(a22) On information and belief, Udio's ordinary-course business records include state-by-state (and, where tracked, metro-area) breakdowns of accounts, paid subscribers, revenue, and usage volume, including metrics for Illinois and the Chicago metropolitan area;

(a23) According to its privacy policy[1], Udio's systems record the locations of user sessions through IP geolocation or equivalent services, and Udio uses that information to detect fraud, enforce terms, and manage abuse—demonstrating Udio's knowledge of and intent to serve Illinois users;

(a24) Udio's platform has generated, delivered, and distributed into Illinois outputs that incorporate, are derived from, or are substantially similar to Plaintiffs' copyrighted musical works and sound recordings, including outputs created and consumed by Illinois users through Udio's platform;

(a25) Udio's platform has generated, delivered, and distributed into Illinois voice-simulative outputs that replicate or closely simulate protected vocal identifiers of Plaintiffs and other Illinois residents, and Udio uses the availability of such outputs to market, promote, and sell its subscription service to users, including users in Illinois;

(a26) Udio provides customer support to users in Illinois and maintains support records reflecting recurring interactions with Illinois customers;

(a27) Udio's mobile application uses push notifications and/or similar mechanisms to communicate with user devices located in Illinois, reflecting continuing Illinois-directed engagement;

(a28) Udio uses cookies and similar tracking technologies on its web interface and collects usage data from Illinois users as part of user authentication, analytics, and service operation;

[1] https://www.udio.com/privacy-policy

(a29) Udio has publicly represented rapid and large-scale user growth, and on information and belief that user base includes a substantial number of Illinois users, given Udio's nationwide availability, nationwide marketing reach, and subscription model;

(a30) Udio's global/nationwide marketing necessarily reaches and is consumed by Illinois residents who use the service;

(a31) Certain Plaintiffs are Illinois-based artists and/or Illinois-based businesses whose works, recordings, and related interests are commercially exploited in Illinois markets, and Udio's conduct has caused and continues to cause injury in Illinois and this District;

(a32) Udio's service is designed to generate music that can substitute for licensed works and performances, and Udio monetizes that substitutability through subscriptions purchased by Illinois users and through the delivery of outputs into Illinois;

(a33) Udio's Illinois contacts are suit-related because Plaintiffs' claims challenge Udio's monetization and dissemination of AI outputs, including in Illinois, built on Udio's alleged unauthorized copying/ingestion and identity/biometric exploitation;

(a34) Udio's Illinois contacts are suit-related because Udio's recurring subscription revenue and growth (including revenue derived from Illinois subscribers) is, on information and belief, driven in material part by the platform's ability to generate high-fidelity, human-like, and recognizable

outputs that Plaintiffs allege infringe their works and exploit their voices and identities;

(a35) Udio's Illinois contacts are suit-related because Udio's platform encourages and facilitates downstream distribution and commercialization of AI-generated outputs by users, including Illinois users, increasing Udio's revenue and market share;

(a36) Udio has collected, captured, processed, stored, and commercially used biometric identifiers and/or biometric information of Illinois residents, including voiceprints and/or voice-derived embeddings, through its AI systems, and Udio's commercialization of its service in Illinois necessarily involves ongoing use of such biometric-derived features for generation, personalization, and output fidelity;

(a37) Udio's Illinois statutory violations are suit-related because Udio uses the ability to generate human-sounding and voice-simulative outputs to market and sell subscriptions in Illinois and to drive paid tiers used by Illinois customers;

(a38) Udio's Illinois statutory violations are suit-related because Udio disseminates voice-simulative outputs to and within Illinois as part of its ongoing service performance and subscription commerce with Illinois customers;

(a39) On information and belief, Udio maintains restrictions, guardrails, and/or moderation systems and applies or tunes those systems in

connection with user location and regulatory compliance, including for Illinois users;

(a40) On information and belief, Udio's platform records prompt strings, generation parameters, and output identifiers for user accounts, including accounts accessed from Illinois, as part of quality control, abuse prevention, and feature development;

(a41) On information and belief, Udio's systems retain generation metadata and user-history data that reflect repeated Illinois-based use and repeated delivery of outputs into Illinois;

(a42) On information and belief, Udio uses Cloudflare as part of its domain name system and/or content delivery and security stack for its web and/or mobile services, as reflected by the Cloudflare nameservers used for "udio.com";

(a43) Cloudflare maintains data center infrastructure in Chicago and routes traffic for Cloudflare-served domains to the data center closest to the traffic source; accordingly, on information and belief, Udio routes and serves user traffic originating from Illinois through Cloudflare points of presence and edge infrastructure located in Illinois, including in and around Chicago;

(a44) Udio's use of Illinois-based edge infrastructure facilitates delivery of Udio's platform content and outputs into Illinois and facilitates user authentication, session security, and service performance for Illinois customers;

(a45) On information and belief, Udio configures and pays for Cloudflare services (including caching, bot protection, DDoS mitigation, TLS termination, rate limiting, and logging) that apply to Illinois user traffic and thereby constitutes deliberate operational support for Illinois service delivery;

(a46) On information and belief, Udio receives, processes, and can access logs and analytics reflecting requests served through Cloudflare infrastructure (including request counts, response characteristics, and geographic distributions), further reflecting Udio's knowledge of and control over Illinois service delivery;

(a47) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio deploys advertising pixels and analytics scripts (including Google/DoubleClick, Meta/Facebook, TikTok, Snapchat, Spotify, Reddit, Hotjar, Appsflyer) to market the service, measure conversions, and optimize acquisition. On information and belief, those tools provide Udio with state/metro-level reporting (at minimum IP-derived geography) such that Udio knows its Illinois user traffic, signups, and paid conversions, and Udio uses that data to continue acquiring and monetizing Illinois users. These forum contacts are deliberate, measured, and repeated, not "random" website accessibility;

(a48) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio hosts and serves AI-generated audio and video assets (including mp3 and mp4 files) from cloud storage endpoints (e.g., Google Cloud Storage storage.googleapis.com/),

and Udio's web application streams and delivers those files to users' browsers wherever accessed, including Illinois and this District. Because Udio's platform publicly serves playable tracks to any visitor (not just the generating user), Udio itself, not merely end users, distributes and publicly performs the infringing/suit-related audio content into Illinois via Udio's own delivery mechanisms;

(a49) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio provides an embeddable player/content endpoint (e.g., /embed/{id}) that delivers Udio-hosted songs andcontent for display in iframes, enabling Udio-generated songs to be embedded and played on third-party websites, including websites accessed in Illinois. On information and belief, Udio's embed feature is designed to increase dissemination and plays of Udio content (including suit-related content) and therefore purposefully expands distribution/public performance into Illinois;

(a50) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio assigns users/visitors a persistent anonymous identifier (e.g., anonId), enabling Udio to correlate usage across sessions and associate activity with location and account/payment data;

(a51) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio uses Sentry (error/performance monitoring) and similar telemetry to collect and retain

operational data about user sessions and requests. On information and belief, such tracing/telemetry necessarily records session and request metadata (including IP-derived geolocation or other location proxies) sufficient for Udio to identify Illinois-origin traffic, diagnose Illinois user issues, and optimize service delivery and monetization for Illinois users;

(a52) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio uses GrowthBook for A/B testing/feature flags; on information and belief Udio can and does segment deployments and pricing/offer experiments by cohorts that include geographic cohorts, further demonstrating Udio's active monitoring and targeting of Illinois usage;

(a53) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio's web app communicates with backend services (including *.supabase.co and Udio-controlled domains) via client-side network calls, meaning Illinois user interactions (prompting, browsing, streaming, account management) generate repeated, logged requests tied to Illinois sessions;

(a54) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio uses Mailchimp APIs consistent with email marketing and lifecycle communications, and on information and belief sends acquisition and retention communications to users and prospective users in Illinois, further evidencing Illinois-directed commercial outreach;

(a55) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio's public-facing web application is instrumented with Google Tag Manager (GTM) and Google Analytics 4 (GA4), which are loaded on the landing and entry pages (not merely permitted by policy), demonstrating Udio's deliberate use of analytics and marketing instrumentation to track, measure, and optimize user acquisition and conversion. On information and belief, GA4/GTM provide Udio with geographic reporting (including state-level and metro-level analytics based on IP/device signals) such that Udio can and does identify, quantify, and monetize Illinois traffic and conversions, and Udio's continued operation of these tools reflects purposeful exploitation of Illinois markets rather than passive accessibility;

(a56) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio intentionally loads its tracking/analytics stack at the earliest stage of user interaction (landing/entry pages), so that Illinois visitors generate analytics and telemetry records immediately upon accessing the service, reinforcing that Udio's Illinois contacts are continuous and systematically monitored;

(a57) Udio's web application appears to be deployed using a managed hosting/deployment platform (reflected by deployment-marked asset URLs and allowances for Vercel-hosted scripts). On information and belief, Udio uses a nationwide edge/content delivery network to distribute its

application code and assets efficiently to users throughout the United States, including users in Illinois and this District;

(a58) As reflected in Udio's publicly available client-side code (including its Content Security Policy and embedded scripts), Udio's site is configured with social sharing and preview metadata (Open Graph/Twitter card tags) and related platform integrations, evidencing that Udio intentionally facilitates and encourages broad dissemination and consumption of Udio-hosted content through social channels accessible in Illinois and this District;

(a59) Udio's ongoing business model includes subscription commerce, interactive service performance, and delivery and dissemination of outputs into Illinois, which are substantial and suit-related;

(a60) Illinois has a strong interest in providing a forum for redressing unlawful biometric and identity exploitation of Illinois residents and unlawful commercialization that harms Illinois creators and Illinois commerce;

(a61) Plaintiffs, including Illinois residents and Illinois-based businesses, have a strong interest in obtaining relief in Illinois for claims that arise out of or relate to Udio's Illinois-directed subscription commerce and delivery of outputs and services into Illinois;

(a62) The burden on Udio to litigate in Illinois is not undue given Udio's intentional nationwide commerce, ongoing subscription relationships with Illinois customers, and purposeful delivery of an internet-based service into Illinois and this District;

(a63) Litigating in Illinois promotes efficient resolution because Udio's Illinois-directed conduct and Illinois statutory claims are central to the case and involve Illinois-based Plaintiffs, evidence, and market impacts;

(a64) For all these reasons, Udio could reasonably anticipate being haled into court in Illinois for claims arising out of or relating to its Illinois-directed subscription commerce, interactive service performance, and delivery and dissemination of infringing and voice-simulative outputs into Illinois, and the exercise of specific personal jurisdiction here is consistent with due process and fair play.

46. The Court also has supplemental jurisdiction over Udio as to the state-law claims because they arise out of a common nucleus of operative fact with the federal claims over which the Court has personal jurisdiction, and exercising supplemental jurisdiction is consistent with due process and promotes judicial economy.

47. Venue is proper in this District as to Plaintiffs' Title 17 claims (including claims under the Copyright Act and the DMCA) pursuant to 28 U.S.C. § 1400(a) because Udio "may be found" in this District in that Udio is amenable to specific personal jurisdiction in this District with respect to the Title 17 claims. Venue is also proper in this District as to Plaintiffs' non-Title 17 claims pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Udio "resides" in this District for purposes of § 1391 because Udio is subject to personal jurisdiction in this District with respect to this civil action (28 U.S.C. § 1391(c)(2)), and because Udio's contacts with this District are sufficient such that, if this

District were a separate state, this District would be a proper venue (28 U.S.C. § 1391(d)). Venue is also proper under § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this District, including Udio's ongoing Illinois-directed subscription commerce, delivery of infringing and voice-simulative outputs into Illinois, and collection and exploitation of Illinois residents' biometric identifiers and protected identity attributes through Udio's platform. At least one named Plaintiff resides and suffered harm in this District, and numerous other class members are similarly located here. Without limitation, and as further alleged in paragraph 45, including subparagraphs (a1) to (a64):

(a1) Plaintiffs' Title 17 claims are properly venued in this District under § 1400(a) because Udio "may be found" in this District in that Udio is amenable to specific personal jurisdiction in this District for the Title 17 claims;

(a2) Udio is "found" in this District because Udio deliberately and continuously conducts commercial activity with residents of this District through its subscription-based AI music service;

(a3) Udio is "found" in this District because Udio contracts with users in this District through its Terms of Service and subscription purchase flows;

(a4) Udio is "found" in this District because Udio accepts and processes subscription payments from users in this District and thereby engages in recurring transactions with customers in this District;

(a5) Udio is "found" in this District because Udio repeatedly performs its subscription service for users located in this District by receiving their requests and delivering outputs into this District;

(a6) Udio is "found" in this District because Udio transmits and delivers digital music outputs into this District in response to user prompts submitted from within this District;

(a7) Udio is "found" in this District because, on information and belief, Udio has generated and delivered into this District outputs that are alleged to infringe or be derived from Plaintiffs' copyrighted works and sound recordings;

(a8) The acts giving rise to Plaintiffs' Title 17 claims include Udio's distribution, delivery, and provision of allegedly infringing outputs to users located in this District;

(a9) The acts giving rise to Plaintiffs' Title 17 claims include Udio's transmission of generated outputs into this District through its website and mobile application interface;

(a10) The acts giving rise to Plaintiffs' Title 17 claims include Udio's repeated provision of access to allegedly infringing outputs to users located within this District as part of Udio's subscription service;

(a11) To the extent Udio makes AI-generated music outputs available for playback, streaming, or downloading through its platform, those acts occur in this District when Udio transmits those outputs to devices and users located in this District;

(a12) Udio's inclusion of Illinois in its intended market (worldwide) is a component of Udio's presence in this District for purposes of § 1400(a);

(a13) for claims governed by the general venue statute, venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Udio "resides" in this District within the meaning of § 1391(c)(2) and § 1391(d) in that Udio's contacts with this District would be sufficient to subject it to personal jurisdiction in this District if this District were a separate State;

(a14) Udio "resides" in this District for purposes of § 1391(b)(1) because Udio deliberately and continuously sells subscriptions and provides ongoing service to users in this District;

(a15) Udio "resides" in this District for purposes of § 1391(b)(1) because Udio enters ongoing contractual relationships with users in this District and renews those subscription contracts on a recurring basis;

(a16) venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District;

(a17) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's service is performed here through repeated interactive sessions initiated from this District;

(a18) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio receives prompts and other user inputs transmitted from devices located in this District;

(a19) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio generates outputs in response to prompts originating from this District and transmits those outputs into this District;

(a20) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio delivers AI-generated music files and related digital outputs into this District;

(a21) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio enables users in this District to stream, play back, and/or download and store AI-generated outputs in this District;

(a22) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio maintains user accounts and generation libraries that users in this District repeatedly access from within this District;

(a23) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's subscription commerce includes billing, renewal, and transactional communications with users in this District (including receipts and renewal notices, on information and belief);

(a24) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because, on information and belief, Udio's platform stores and serves generation history, account metadata, and output identifiers for users who access Udio from this District;

(a25) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's platform is designed for repeated

creation and regeneration of outputs and Udio repeatedly provides those functions to users in this District;

(a26) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's platform enables features that are used by users in this District and result in delivery of music and voice-simulative outputs into this District;

(a27) a substantial part of the events giving rise to Plaintiffs' BIPA-related claims occurred in this District because Udio collects, captures, processes, and commercially uses biometric identifiers and biometric information of Illinois residents, including residents of this District, through provision of its service to those residents;

(a28) a substantial part of the events giving rise to Plaintiffs' BIPA-related claims occurred in this District because Udio's alleged failures to provide required disclosures, obtain required written releases, and maintain required policies occur in connection with Udio's onboarding and provision of services to Illinois residents in this District;

(a29) a substantial part of the events giving rise to Plaintiffs' BIPA-related claims occurred in this District because Illinois residents in this District are among those whose voices and voiceprints are allegedly captured and exploited through Udio's systems;

(a30) a substantial part of the events giving rise to Plaintiffs' IRPA-related claims occurred in this District because Udio commercially exploits

protected identity attributes, including distinctive voices, of Illinois residents and disseminates voice-simulative outputs to and within this District;

(a31) a substantial part of the events giving rise to Plaintiffs' IRPA-related claims occurred in this District because Udio's subscription commerce in this District monetizes and profits from the availability and delivery of voice-simulative outputs to users in this District;

(a32) a substantial part of the events giving rise to Plaintiffs' UDTPA-related claims occurred in this District because Udio markets and sells its AI music service to consumers in this District through its website, mobile application, and related materials and transactions reaching consumers in this District;

(a33) a substantial part of the events giving rise to Plaintiffs' UDTPA-related claims occurred in this District because Udio's alleged misrepresentations, omissions, or misleading commercial practices are disseminated to and relied upon by users in this District in connection with subscription purchases and use of the service;

(a34) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Plaintiffs are Illinois-based artists and Illinois-based entities whose works and recordings were created and recorded in this District and whose commercial and reputational interests are centered here;

(a35) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because certain Plaintiffs' masters, recordings, and

related business records are maintained in this District and form part of the evidence relevant to the claims;

(a36) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's allegedly infringing and voice-simulative outputs are delivered here and affect Plaintiffs' commercial opportunities in local Illinois markets where Plaintiffs perform, license, and monetize their works;

(a37) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's platform encourages dissemination of outputs to third-party services, and outputs created by users in this District may be published and circulated from within this District, increasing the challenged distribution and market effects in this District;

(a38) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Udio's integration with third-party platforms and devices (including voice assistants and embedded AI tools) expands the distribution of Udio's service to users in this District and results in performance and delivery of outputs into this District;

(a39) Udio uses content-delivery and security infrastructure to provide its service in this District, including infrastructure located in Illinois. For example, Udio uses Cloudflare or similar edge and security infrastructure to deliver its service, and requests from users in this District are routinely served through Chicago-area and Illinois-based points of presence;

(a40) Udio's use of Illinois-based edge infrastructure facilitates delivery of Udio's platform content and outputs into this District and constitutes part of the operational events giving rise to Plaintiffs' claims. Specifically, Udio's web app serves key media assets (including cover art and user/profile images) via a dedicated asset delivery network (imagedelivery.net), reflecting deliberate use of third-party CDN/edge infrastructure to deliver content efficiently to end users, including in Illinois and this District;

(a41) Udio collects and processes IP addresses and session/device metadata when users in this District access the service, and those District-originated access events are part of Udio's course of conduct giving rise to Plaintiffs' claims;

(a42) Udio's ordinary-course business records and analytics include geographic breakdowns of usage and revenue, including data identifying usage and revenue from this District;

(a43) Udio's service operations include authentication, fraud prevention, and abuse prevention events that occur whenever users in this District use the service, and those operational events are part of the provision and performance of Udio's service in this District;

(a44) Udio transmits account confirmations, receipts, renewal notices, and related communications to users in this District as part of subscription performance, tracking, and customer servicing;

(a45) Udio maintains customer support channels (including real-time web communications through Intercom) and support records associated

with users in this District, reflecting ongoing two-way communications and business operations and transactions in this District;

(a46) Udio's platform retains generation metadata and output identifiers associated with accounts accessed from this District, reflecting repeated output delivery and use in this District;

(a47) Udio's platform retains prompt strings, generation parameters, and related records for quality-control and abuse-prevention purposes associated with sessions originating in this District;

(a48) Venue is proper as to all claims because they arise from a common nucleus of operative facts involving Udio's unified course of conduct—including subscription commerce, service delivery, and output distribution into this District—such that adjudicating all claims together in this District will promote efficiency and avoid fragmentation;

(a49) Illinois has a substantial local interest in adjudicating disputes involving alleged collection and commercial exploitation of Illinois residents' biometric identifiers and identity attributes under Illinois statutes, and this District is an appropriate venue for such claims because those claims are Illinois-centered by definition.

(a50) this District is an appropriate venue because Plaintiffs are located here, Plaintiffs' works and recordings were created here, and the impacts of Udio's alleged unlawful practices are materially felt here in Plaintiffs' home market, and Udio's Illinois-directed commerce is continuous and substantial.

## FACTUAL BACKGROUND

48. Plaintiffs are independent artists and producers who own or exclusively control valuable copyrights and related rights in numerous sound recordings. Exhibit A, which is attached and incorporated by reference, includes a non-exhaustive sample of the copyrighted sound recordings (the "Copyrighted Recordings") that Udio has infringed. Sound recordings in Exhibit A that were registered with the U.S. Copyright Office are specifically identified.

*Udio's Launch in 2024 and Rapid Growth*

49. In April, 2024, former Google DeepMind researchers launched Udio, an AI music-generation service. They promoted it as a tool that lets anyone, from classically trained musicians to casual users, create songs in seconds.[2] Udio's goal is to make music that sounds indistinguishable from music created by professionals. Udio has millions of monthly users.

50. Udio lets users generate music by entering text prompts (e.g., genre, lyrics, story direction, themes) or by uploading audio; paid subscribers may upload a sound recording to "greatly enrich [the] prompting vocabulary."[3]

---

[2] Udio, Former Google Deepmind Researchers Assemble Luminaries Across Music And Tech To Launch Udio, A New AI-Powered App That Allows Anyone To Create Extraordinary Music In An Instant, PR Newswire (Apr. 10, 2024), https://www.prnewswire.com/news-releases/former-google-deepmind-researchers-assemble-luminaries-acrossmusic-and-tech-to-launch-udio-a-new-ai-powered-app-that-allows-anyone-to-create-extraordinary-music-in-aninstant-302113166.html.

[3] @udiomusic, X (June 5, 2024), https://x.com/udiomusic/status/1798369297758077066.

The service returns audio files within seconds, and users can iterate with a built-in “remix” feature.

51. At launch, Udio was free, capped at 600 generated files per month. On May 8, 2024, Udio introduced paid tiers: $10/month for 1,200 credits (generate up to 6 songs simultaneously) and $30/month for 4,800 credits (generate up to 8 songs simultaneously). Users can also create full-length tracks and remix without limit. However, these outputs rely entirely on Udio’s unauthorized copying and use of copyrighted music, significantly damaging the value and integrity of original works created by independent artists.

52. Free users can download MP3; subscribers can also download WAV and stems (Vocals, Drums, Bass, Other). Users own their outputs and (if created on a free account) must provide reasonable attribution to Udio; paid subscribers aren’t required to attribute.

53. Notable product updates since launch include an iOS app (May 21, 2025), “Sessions” (a waveform-centric editing workspace, June 26, 2025), and “Voices” (tools for tighter, reusable vocal control, Sept. 11, 2025). Udio also offers “Styles” and a curated Style Library to reference vibes across songs.

54. Udio’s subscription model encourages users to create and commercially use these digital music files across major content-sharing and streaming platforms, including YouTube, TikTok, Spotify, Instagram Reels, and SoundCloud. Each higher tier offers significantly more potential song credits. This ensures Udio profits more as additional tracks enter the market. Udio

presents itself as a smooth alternative to legal music licensing, allowing millions of “new” tracks to flood the market at minimal cost.

55. Udio’s outputs flood the market with background, incidental, and production music, reducing demand, lowering prices, and decreasing licensing opportunities for independent artists’ works.

56. Udio’s commercial tiers, “Sessions”, “Voices” and “Styles” features target the same customers who would otherwise license or commission music.

57. Despite its widespread commercial success and aggressive market stance, Udio’s quick rise has come at the cost of music creators whose copyrighted works were improperly used to train Udio’s AI models.

58. Major music industry stakeholders, including Universal, Sony, and Warner (through the RIAA), have sued Udio, alleging substantial and willful infringement through unauthorized use of their copyrighted music catalogs.

59. Instead of stopping its infringing practices, Udio continues to claim a questionable "fair use" defense, intentionally harming rights holders and undermining established intellectual property protections meant to safeguard artists and creators.

*Udio Trains its AI Using Copyrighted Recordings*

60. Udio’s generative AI technology attempts to imitate tasks usually done by humans, especially in creating and producing music. Unlike a human musician who might listen selectively to music over a lifetime for inspiration, Udio’s AI systematically copies and analyzes tens of millions of copyrighted sound recordings in their entirety. This process is fundamentally different from

simple "listening," since no human could realistically listen to or fully absorb the vast amount of music that Udio's AI processes. It involves large-scale ingestion and parameter fitting across entire recordings. After encoding the statistical patterns and expressive features in those recordings, Udio's AI synthesizes new tracks by sampling from that encoding, so the outputs remain conditioned on, and constrained by, the training corpus.

61. Based on information and belief, Udio copied and used a significant number of the copyrighted recordings without permission. Independent artists' recordings were especially vulnerable, as many are publicly accessible online, even though they are protected by copyright. Udio's claims of creating high quality would be impossible without directly copying, analyzing, and incorporating the expressive elements from these protected works.

62. On information and belief, Udio (and/or its agents) bypassed encryption, paywalls, API access controls, or streaming DRM to acquire source audio and lyric text, in violation of 17 U.S.C. § 1201(a)(1); and used, offered, or procured tools primarily designed for such circumvention in violation of § 1201(a)(2) and/or § 1201(b)(1).

63. One Udio investor explained that "the only practical way generative AI models can exist is if they can be trained on an almost unimaginably large amount of content, much of which … will be subject to copyright."[4] Instead of

---

[4] M. Ford, "Silicon Valley's Big A.I. Dreams Are Headed for a Copyright Crash", New Republic (Nov. 15, 2023), https://newrepublic.com/article/176932/silicon-valley-ai-copyright-law.

obtaining licenses or respecting attribution, Udio decided to scrape (i.e., copy/download) large amounts of copyrighted content from digital sources. This method allowed it to build a huge training corpus for its AI models without being limited by licensing constraints.

64. By way of example, Udio obtained many of the copyrighted sound recordings in its training set by illicitly downloading them from YouTube using "stream-ripping," a well-known method of music piracy.

65. YouTube is designed for streaming, not copying. It allows users to play content as it is retrieved, but prohibits making permanent, unrestricted downloads. Plaintiffs upload certain copyrighted recordings to their official YouTube channels and conspicuously identify their protected status, including the label, copyright owner, etc.

66. Like other streaming services, YouTube bars unauthorized copying and employs technical protections to stop it. For example, YouTube uses an evolving "rolling-cipher" system that controls access to the underlying media files and prevents direct downloads of licensed content. *See Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024) (noting streaming services encrypt media to prevent unauthorized copying).

67. YouTube applies the rolling-cipher process with the authority of Plaintiffs as copyright owners to govern access to each sound recording Plaintiffs upload. While the rolling cipher incidentally hinders downstream copying, its primary function is to control the initial, authorized access path by

which clients retrieve and assemble the expressive content. The same access-gating process applies whether the user watches in real time or any client seeks to fetch the data wholesale. Access to the recording's audiovisual data requires application of that process. Requests lacking a valid, cipher-derived signature are denied; authorized playback succeeds only when the owner-approved process is executed. In practical operation, the rolling cipher controls access to the work by gating the retrieval and assembly of the audiovisual data that embodies the sound recording itself, not merely the creation of a permanent copy. The player's ability to present the recording to the user depends on successful execution of this owner-authorized process.

68. Plaintiffs authorize YouTube to apply the rolling cipher and related time modulation protocols (TPMs) to their uploads, and to condition client access on execution of that process.

69. Despite these protections, third-party tools exist that circumvent YouTube's rolling cipher and generate unrestricted copies of copyrighted files. This practice, commonly called "stream-ripping", has been held unlawful. *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at 9 (E.D. Va. Dec. 16, 2021), report and recommendation adopted, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022).

70. On September 2, 2025, the International Confederation of Music Publishers (ICMP) publicly revealed evidence, including private datasets,

showing that Udio used stream-ripping to acquire copyrighted sound recordings from YouTube.[5]

71. Udio's acquisition of Plaintiffs' Copyrighted Recordings for training was accomplished, among other ways, by unlawfully bypassing YouTube's rolling cipher and other technological measures that restrict downloading and copying of licensed content.

72. Unknown Defendants provided a service or technology to Udio primarily designed to circumvent YouTube's rolling cipher, which effectively protects Plaintiffs' rights under §106 by preventing unauthorized reproduction, in violation of § 1201(b)(1)(A); and/or effectively controls access to the work, in violation of §1201(a)(2).

73. By circumventing those technological measures, Udio violated the Copyright Act's anti-circumvention provisions: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

74. Udio's stream-ripping and copying were unauthorized, unlawful, and integral to the creation of its models. Those violations are not excused by any later product changes or technical guardrails.

75. Udio did not stop at stream-ripping and copying. On information and belief, Udio maintains centralized, persistent corpora of audio and lyric

---

[5] Richard Smirke, 'The Largest IP Theft in Human History': Breaking Down the Years-Long Investigation Into How AI Firms are Stealing Music, Billboard (Sept. 9, 2025), https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/.

files, separate from transient training shards, that engineers can and do access to make additional copies for evaluation, ablation testing, alignment, red-teaming, and fine-tuning iterations. These corpora include works Udio scraped without authorization.

76. Udio's retained corpora are used for non-training engineering workflows (e.g., test harnesses, regression suites, prompt-response evaluation, retrieval-augmented generation experiments, voice timbre matching, and guide-track alignment). Each such use reproduces and redistributes copies internally and sometimes to vendors/partners, independent of any "training" defense.

77. On information and belief, Udio staff and contractors had search and browse access to these corpora, and Udio lacks a copy accounting or deletion protocol, resulting in unbounded downstream copying.

78. Where Udio initially acquired recordings/lyrics from pirated/shadow-library sources or streams defeated by circumvention, those copies were retained and repurposed even when alternative sources later became available. Retention and repurposing of such pirated copies is not excused by any claim of "training" fair use.

79. Each retention, internal replication, and reuse counts as a separate act of reproduction and, when CMI was removed, a new DMCA §1202(b) violation.

80. On information and belief, Udio distributed copies of Plaintiffs' works (or substantial portions) by sharing corpora or sub-sets with service

providers and/or enterprise partners (including for integration, benchmarking, or fine-tuning support). Specific channels and modes of third-party dissemination, including third-party cloud compute/storage, contractors and collaborators, multi-entity data pipelines, and off-site/disaster-recovery replication, are detailed in Count II.

*Udio Removes or Alters Copyright Management Information (CMI)*

81. On information and belief, Udio's training of generative AI involves a deliberate, multi-step process designed to remove or alter copyright management information ("CMI") embedded in original recordings. This process includes acquisition, conversion to raw audio formats, standardization of audio parameters, and segmentation into anonymous snippets:

a. *Acquisition*. Udio systematically copied tens of millions of copyrighted sound recordings from online digital sources, creating a vast dataset (or "corpus") used to train its AI models.

b. *File conversion and metadata removal*. Udio converted the downloaded audio files, typically in MP3 or similar formats, into raw, metadata-free formats such as WAV files or audio spectrograms. This process automatically removes critical metadata, including ID3 tags, artist names, song titles, producer credits, album information, embedded artwork, licensing information, and copyright notices. As a result, the audio files become anonymized, losing their original attribution to rightful owners.

c. *Format standardization*. After converting recordings into anonymized formats, Udio further processes these files by standardizing their

audio parameters, and re-encodes the recordings into uniform sample rates and bit depths to facilitate optimal AI training. While this additional step permanently eliminates any remaining metadata and identifiers, the underlying creative content, such as melodies, harmonies, rhythms, and vocal performances, remains fully intact, thus preserving the infringement.

d. *Disassociation via audio segmentation*. Following standardization, Udio deliberately segments the audio into short, disassociated snippets, removing any remaining context linking the segments to their original sources. On information and belief, Udio segmented the audio tracks into smaller clips, specifically designed for efficient AI "batch" processing. Segmenting tracks into short snippets removes any remaining traceable context, ensuring the original authors or performers cannot be readily identified from the resulting anonymized audio.

82. This audio-focused “strip-and-slice” pipeline is only half the story. Udio runs a similar process on the lyrics that accompany those recordings. Publicly available research papers and Udio’s marketing reference the use of “web-scale” text datasets such as Common Crawl. Those corpora contain millions of full-text lyric files scraped from Genius, AZLyrics, Lyrics.com, and similar sites.

83. Udio’s pipeline converted each lyric file to raw text, stripped header metadata (song title, writer, publisher), and tokenized the text for training. Each of these steps created unlawful intermediate copies of lyrical works. Udio’s pipeline intentionally removes CMI, knowing that anonymized copies will

be retained, reused, and distributed via outputs without attribution, inducing and concealing downstream infringement.

84. Udio thereafter fine-tuned its AI models on smaller lyric-heavy datasets to improve rhyme-scheme, syllabic cadence, and semantic-to-melody alignment—something impossible without access to protected lyric content.

85. Udio's process intentionally ensures that original metadata, including CMI, is never preserved, restored, or otherwise maintained. This systematic removal or alteration of CMI violates 17 U.S.C. § 1202(b), as the discarded metadata explicitly informs the public, and the creators themselves, of authorship, ownership, and licensing status.

86. Once Udio has fully anonymized and segmented the recordings, it feeds these snippets into its generative AI models, initiating the training phase.

87. Udio trains its models with the purpose and expectation that the system will emit audio resembling recognizable works or artists without source attribution, a result enabled by its prior CMI removal.

88. Udio further refines its models by selectively fine-tuning them on smaller, curated subsets of music data, enhancing their ability to accurately reproduce specific musical styles, characteristics, and artist signatures.

89. Technically, Udio's models exhibit an AI phenomenon called "overfitting," occurring when an AI system memorizes specific details or passages from its training data rather than simply learning generalized patterns. Overfitting enables the AI to reproduce segments from original recordings rather than merely generating music inspired by general musical

styles. For instance, when prompted for a "Chicago blues tune," an overfitted AI may directly replicate distinctive melodic lines, or instrumental textures from specific copyrighted recordings.

90. Udio's claim that it generates human-sounding or high quality music critically depends upon its unauthorized copying and exploitation of real human-created music. Udio's CEO and co-founder explained that Udio had to "train on a large amount of publicly-available and high-quality music" to "get high-quality outputs" He further explained that "People don't want 'AI-produced music' or 'machine-produced music'. They want music that sounds indistinguishable from music that's created by professional human producers."[6]

91. Importantly, attempts by Udio to obscure or conceal such overfitting through minor technical adjustments or "guardrails" do not negate the initial unlawful acts. The unauthorized copying of copyrighted recordings occurs at the point of ingestion into the AI training corpus. Any subsequent obfuscation of how precisely the AI reproduces original works does not cure or excuse the fundamental infringement, particularly given Udio's intentional removal of CMI to disguise the source of its data.

92. Udio distributes these CMI-stripped outputs to paying users as generated tracks, knowing they will be uploaded and exploited on third-party

---

[6] Stuart Dredge, AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder, Music Ally (Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.

platforms without proper attribution, further concealing infringement. These outputs trade on the commercial value of the original artists' identities, including their distinctive voices, creating the false impression of affiliation or endorsement and appropriating persona value without consent.

93. Udio's systematic ingestion of tens of millions of copyrighted recordings, ranging from prominent hits to independent tracks, without preserving or respecting associated metadata, constitutes numerous separate violations of § 1202(b). Given the scale of this misconduct, the resulting statutory damages are potentially enormous, reflecting the gravity of Udio's infringement and deliberate disregard for copyright law.

*Outputs Are Not Required for Liability;*
*Udio's Model Purpose and Scale Create Market Harm*
*Even Absent Plaintiff-Specific Matches*

94. Udio's infringement completes at reproduction, when Udio copies Plaintiffs' works into its corpora and training pipelines. An AI model cannot consistently replicate distinctive elements, such as specific riffs, unique vocal stylings, or signature instrumental textures, unless those recordings were first included and memorized during its training.

95. As stated earlier, public statements by Udio and investors underscore a deliberate strategy to build competitive, radio-quality substitutes without constraints, confirming the commercial purpose and foreseeable market effects of Udio's conduct. These admissions underscore Udio's intentional disregard for standard licensing obligations, knowingly accepting infringement as part of its business model in pursuit of commercial gain.

96. Udio's unauthorized copying has become apparent even to casual users, tech journalists, and industry experts, who regularly observe Udio's AI producing outputs similar to popular songs.[7] These widespread public observations reinforce the conclusion that Udio systematically copied and ingested extensive copyrighted music into its training data without permission.

97. Despite clear evidence of infringement, Udio refuses to disclose the specific contents of its training dataset, labeling them "confidential business information." This deliberate evasiveness is intended to conceal the scale of unauthorized copying. Nevertheless, frequent outputs containing recognizable hooks, iconic vocal phrases, and signature musical elements confirm that Plaintiffs' copyrighted works were directly copied by Udio.

*Udio Cannot Claim Fair Use for Its Systemic Infringement*

98. In response to allegations of unauthorized copying, Udio has previously asserted and is expected to assert in this case that its use of copyrighted sound recordings for AI training constitutes fair use. This defense implicitly acknowledges that Udio engaged in unlicensed copying, as fair use considerations arise only when such unauthorized use has occurred.

99. Fair use does not apply to Udio's training or model operations. Udio's copying is not for indexing, search, or accessibility. It serves the same commercial purpose as Plaintiffs' works—creating, licensing, and monetizing

---

[7] Ed Newton-Rex, "Yes… Udio's Output Resembles Copyrighted Music, Too", Music Business Worldwide (Apr. 18, 2024), https://www.musicbusinessworldwide.com/yes-udios-output-resembles-copyrighted-music-too/.

recorded music and vocal performances. Furthermore, Udio's use does not critique or comment on Plaintiffs' works and aims to replace human-made recordings with machine-generated substitutes.

100. Udio's ingestion of entire recordings and compositions is not to help users discover Plaintiffs' works; it is to generate new outputs that compete in the same licensing and listening markets.

101. The Copyright Act, codified in 17 U.S.C. § 107, outlines four factors courts use to evaluate fair use:

a. *Purpose and character of the use*. Udio's use is commercial. It copies Plaintiffs' creative works wholesale to develop and market its AI-generated music product, directly profiting from subscriptions and usage fees. Although Udio may argue that training is transformative, a model designed to create works that compete with originals and displace them is less transformative, and factor four then predominates. Udio's product is expressly a substitute for licensed music at scale.

b. *Nature of the copyrighted work*. Plaintiffs' copyrighted recordings are quintessentially creative and artistic, falling squarely within the heartland of copyright protection. The law strongly protects expressive works, especially musical performances, against unauthorized copying and commercial exploitation.

c. *Amount and substantiality of the portion used*. Udio does not selectively or sparingly use Plaintiffs' works. Instead, Udio systematically copies complete sound recordings in their entirety, capturing their creative essence, to

effectively train its AI models. Such extensive and systematic copying clearly favors Plaintiffs and strongly weighs against fair use.

d. *Effect on the market*. Udio's unlicensed copying causes cognizable market substitution and dilution in multiple, well-defined music markets, even where any given AI output is not a near-verbatim copy, because Udio's product supplies close substitutes at scale and is purposely designed and marketed to replace licensed music acquisition and production. The relevant markets include, without limitation:

i. *Sound-recording consumption & monetization*. Streaming and download markets for Plaintiffs' recordings (and long-tail catalog) are diminished as user-creators and platforms substitute Udio-generated tracks for licensed masters. Mechanisms: (A) playlist and background-music displacement; (B) "share-of-ear" substitution on UGC/social platforms; (C) algorithmic recommendation cannibalization when Udio tracks are uploaded to DSPs.

ii. *Indie/long-tail licensing channels*. Bandcamp/Direct-to-fan sales, YouTube Content ID monetization, and micro-sync catalogs lose demand as Udio's model generates cheap substitutes targeted by genre/mood/tempo.

iii. *Composition/publishing revenue*. Mechanical, performance, and sync royalties are diluted when Udio-generated tracks substitute for licensed usages of Plaintiffs' songs in comparable contexts (creator content,

television and film scores, small-business background audio, ads), reducing PRO distributions[8] and publisher receipts.

iv. *Commissioned works and session labor*. Commissions for custom cues, jingles, beds, and hooks are displaced by Udio prompts and in-app refinements, diminishing Plaintiffs' downstream income streams associated with their recordings and compositions.

v. *Lyrics-dependent markets*. Udio's ingestion and lyric-generation capabilities substitute for and dilute markets for lyric reproduction and display (e.g., lyric videos, karaoke, educational uses) and for lyric-driven synchronization, while also reducing demand for licensed derivative uses (e.g., translations, lyric excerpts in audiovisual works).

vi. *Sampling/remix/derivative markets*. Udio's outputs, engineered from Plaintiffs' copyrighted sound recordings and compositions, are used as replacements for licensed samples, stems, remixes, and "beat leases," diverting demand from Plaintiffs' authorized derivative-use markets.

vii. *Live/performance-adjacent and fan-engagement markets*. AI tracks and AI-rendered performances cannibalize demand for authorized live recordings, session work, bespoke "fan song" commissions, and other ancillary monetization tied to Plaintiffs' recordings and personas.

viii. *International sub-markets*. Low-budget global advertising, mobile gaming, and short-video platforms disproportionately substitute AI

[8] PRO refers to Performing Rights Organizations, which collect and distribute royalties from public performances of music, to songwriters and publishers.

tracks for licensed independent music, compounding dilution for long-tail rights holders.

102. Udio's user scale (tens of millions), output quotas (hundreds to thousands of tracks per subscriber per month), and enterprise integrations (e.g., with conversational assistants) make substitution foreseeable and substantial. These are the kinds of market effects courts deem "the single most important element" in fair-use analysis.

103. Mechanisms of dilution and substitution (non-exhaustive examples):

a. *Scale-driven supply shock*. Udio's model and pricing tiers (including high daily output limits and high-quality outputs enable industrial-scale flooding of distribution channels with AI tracks that crowd out human work in feeds, playlists, and catalog searches.

b. *Algorithmic displacement*. Recommendation, search, and playlisting systems prefer abundant, instantly-generated "good-enough" tracks, causing discoverability loss and rank demotion for Plaintiffs' works.

c. *Price suppression/anchoring*. Bundled or low-cost AI outputs reset buyer expectations, driving down sync quotes, library rates, and work-for-hire budgets; buyers substitute cheaper AI rather than licensing Plaintiffs' recordings/compositions.

d. *"Style-of" and voice-replication substitution*. Udio's features replicate signature sonic identities and voices, enabling sound-alike uses that

replace the need to license Plaintiffs' actual works or hire Plaintiffs for new commissions.

e. *Derivative-market cannibalization*. Creators use Udio outputs instead of licensing samples/stems or beats from Plaintiffs, eroding revenues in those derivative markets.

f. *Platform-integration diversion*. Integration into mass-market tools (e.g., assistants, creative suites) diverts project pipelines that previously sourced licensed music toward instantaneous AI generation, foreclosing licensing opportunities mid-workflow.

g. *Attention scarcity and catalog devaluation*. Saturation of AI tracks in the same genres/time-slots dilutes attention, lowers stream share, and devalues Plaintiffs' catalogs (including reduced royalty flows and valuation metrics).

h. *Attribution stripping and source confusion*. Removal/obfuscation of CMI diverts credit and reroutes demand to AI substitutes by disguising provenance, aggravating displacement.

104. All four factors weigh against fair use: (1) Purpose/character: commercial and same-market substitution. (2) Nature: highly creative sound recordings and musical compositions. (3) Amount: wholesale ingestion of works during training is far beyond what is necessary for any non-substitutive purpose. (4) Market harm: Udio's uses impair Plaintiffs' licensing markets and encroach upon distinct licenses for training AI systems.

105. Udio's use of copyrighted recordings and lyrics, rather than public-domain or licensed alternatives, materially increases output quality and human-likeness, thereby increasing substitutability and magnifying market harm. If Udio trained only on non-infringing corpora, its outputs would be less substitutive and less likely to displace Plaintiffs' sales, streams, and licenses.

106. On information and belief, and subject to proof with transactional, platform, and expert data, Plaintiffs will show: (a) lost syncs and reduced sync quotes where buyers selected Udio outputs or used "style-of" prompts to avoid licensing; (b) declines in stream share and playlist placements coincident with Udio's releases and creator-tool integrations; (c) reduced licensing volumes/rates in production-music, micro-sync, and beat-lease markets following Udio's scale-up; and (d) lost commissions for composition/production/session vocals where Udio outputs were used in place of hiring human creators. These forms of substitution, including indirect substitution via market dilution at scale, are harm that § 107(4) recognizes. This factor four, therefore, weighs decisively against fair use.

107. Given these clear facts, each fair use factor decisively weighs against Udio, and factor four is alone, dispositive. Udio's same-market design and scale dilute demand and pricing for Plaintiffs' works and licensing opportunities. Even if training carries some transformative weight, factor four controls, and fair use fails.

108. Udio's actions cause damage far beyond immediate economic harm. Udio's systematic copying and exploitation of copyrighted recordings

threaten the integrity and sustainability of the entire music ecosystem, including the livelihoods of countless musicians, composers, producers, engineers, and others who depend on a fair and functional market for music.

109. Udio's conduct also directly undermines artists' fundamental right to control the use and presentation of their creative work, depriving them of the ability to decide how their music aligns with their aesthetic vision, personal values, and professional identity. By ignoring the need for permission or compensation, Udio spreads a dangerous misconception—that copyrighted music is free to exploit whenever technological innovation makes licensing inconvenient.

110. Sustainable coexistence between AI and human creators can and should be achieved through established free-market licensing mechanisms that properly recognize and compensate the contributions of artists and rights holders. Unlike other AI innovators who engage responsibly through proper licensing arrangements, Udio has chosen to build its business by openly violating Plaintiffs' rights, jeopardizing both creative integrity and market stability.

111. From its inception, Udio has deliberately disregarded the established rights of copyright holders as part of an aggressive strategy to dominate the AI music generation market. Allowing Udio or any generative AI company to succeed through deliberate infringement of copyright law threatens individual artists and the foundational legal and ethical principles that incentivize artistic creation and cultural advancement.

112. Without judicial intervention, Udio will continue to flood the market with derivative, uncredited tracks, further impoverishing the cultural and economic landscape for independent artists. Plaintiffs, therefore, seek damages, injunctive relief, and any other remedies that will halt Udio's unlawful acts and restore the rightful benefits of copyright protection to those who actually create the music.

## **CLASS ACTION ALLEGATIONS**

113. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other similarly situated independent artists ("Class Members"). The term "independent artists," as used herein, broadly includes all individuals, entities, or rights holders—whether artists, musicians, songwriters, producers, estates, heirs, independent labels, or other persons—who create, perform, produce, or own exclusive rights in (a) sound recordings, and/or (b) the lyrics or other textual elements of musical compositions. Specifically excluded from this definition are the named plaintiffs in the Recording Industry Association of America's (RIAA) lawsuit against Udio (Case No. 24-cv-04777, U.S. District Court, S.D.N.Y.) and the named plaintiffs in the lawsuit against Udio (Case No. 1:25-cv-5026, U.S. District Court, S.D.N.Y). Plaintiffs seek certification of the following nationwide classes and subclasses:

a. *Copyright Class*: All independent artists in the United States who own or exclusively control registered copyrights in sound recordings fixed on or after February 15, 1972, that appear in any dataset Udio (or its agents) copied,

ingested, or exploited for AI training during the Class Period as alleged herein, excluding works Udio used under a written license executed by Udio during the Class Period.

b. *Previously-Unregistered Copyright Class*: All independent artists in the United States who own or exclusively control copyrights in original sound recordings that were unregistered with the U.S. Copyright Office at the time Udio (or its agents) copied, ingested, or exploited them for AI training during the Class Period, as alleged herein, excluding works Udio used under a written license executed by Udio during the Class Period.

c. *Lyrics Copyright Subclass*. All independent artists in the United States who own or control registered U.S. copyrights in the lyrics or textual portions of musical compositions that appear in any dataset Udio (or its agents) copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

d. *Previously-Unregistered-Lyrics Subclass*. All independent artists in the United States who own or control copyrights in the lyrics or textual portions of musical compositions that were unregistered with the U.S. Copyright Office at the time Udio (or its agents) copied, ingested, or used them to train, fine-tune, or reinforce-learn its music-generation models during the Class Period, as alleged herein, excluding works Udio used under a written license executed by Udio during the Class Period.

e. *Musical-Composition (Non-Lyric) Registered Subclass*: All persons or entities who, during the Class Period, owned U.S. registered copyrights in the

non-lyric musical-composition elements (melodic, harmonic, rhythmic expression and fixed arrangements) of works that appear in any dataset Udio (or its agents) copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

f. *Musical-Composition (Non-Lyric) Previously-Unregistered Subclass*: All persons or entities who, during the Class Period, owned musical compositions (non-lyric, including melodic, harmonic, rhythmic expression and fixed arrangements) that were unregistered with the U.S. Copyright Office at the time Udio (or its agents) copied, ingested, or used them to train, fine-tune, or reinforce-learn its music-generation models, as alleged herein, excluding works Udio used under a written license executed by Udio during the Class Period.

g. *DMCA Subclass*: All independent artists in the United States whose copyrighted sound recordings and/or musical-composition materials contained Copyright Management Information (CMI) at or before Udio's acquisition, copying, conversion, segmentation, ingestion, training, fine-tuning, or evaluation, and that Udio acquired, copied, converted, processed, or ingested during the Class Period; excluding works Udio used pursuant to a written license executed by Udio during the Class Period.

h. *§ 1201 Anti-Circumvention Subclass*: All independent artists in the United States who own or control copyrights in sound recordings and/or lyrics that, at the time Udio or its agents acquired or accessed them, were made available through platforms, services, or delivery mechanisms employing

technological measures that effectively control access to, or protect rights in, the works (e.g., YouTube's rolling cipher, HTTPS tokening/HLS AES-128 session keying, or DRM such as Widevine/PlayReady/FairPlay), and that Udio or its agents acquired, accessed, copied, converted, processed, or ingested during the Class Period; excluding works Udio used pursuant to a written license executed by Udio during the Class Period.

i. *Illinois Biometric Information Privacy Act Subclass*: All independent artists residing in Illinois who created or performed sound recordings containing distinctive voiceprints or vocal identifiers, which Udio collected, captured, stored, or used without obtaining informed written consent as required under Illinois BIPA (740 ILCS § 14/1, et seq.). This subclass consists of natural persons.

j. *Illinois Right of Publicity Subclass*: All independent artists who are Illinois residents and/or whose identities (including name, voice, signature, photograph, image, or likeness) were used by Udio for a "commercial purpose" in Illinois, without prior written consent, by: (i) reproducing, synthesizing, or simulating their distinctive voices or vocal signatures in Udio-generated outputs; and/or (ii) using their names, voices, or other identifying attributes to advertise, market, or promote Udio's products or services. This subclass consists of natural persons.

k. *Illinois UDTPA Subclass (Injunctive Relief Only)*: All Illinois-resident members of any subclass seeking injunctive relief under 815 ILCS 510/3.

l. *Illinois Unjust Enrichment Subclass*: All Illinois-resident owners of relevant rights whose works, likenesses, or voiceprints appear in any dataset Udio (or its agents) copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

m. Excluded from these classes are Udio, its affiliates, subsidiaries, officers, directors, employees, counsel, immediate family members of such persons, the named plaintiffs in the Recording Industry Association of America's (RIAA) lawsuit against Udio (Case No. 24-cv-04777, U.S. District Court, S.D.N.Y.), the named plaintiffs in the lawsuit against Udio (Case No. 1:25-cv-5026, U.S. District Court, S.D.N.Y), and the presiding judge and court personnel involved in this action.

n. As used above, 'Class Period' means the maximum time span permitted under the applicable statutes of limitations, accrual principles, and tolling doctrines for the claims asserted—including, as applicable, the discovery rule, the separate-accrual doctrine for continuing infringements, continuing-violation concepts, fraudulent concealment, and equitable tolling—measured back from the filing of this action through the date of judgment (or class notice), without waiver of any longer period permitted by law.

o. For avoidance of doubt, nothing in any class or subclass definition limits, waives, or disclaims claims or remedies available under statutes other than the Copyright Act, including without limitation the DMCA, BIPA, IRPA, and UDTPA, and any reference to registration status, statutory damages, or attorneys' fees applies only to Copyright Act claims.

114. *Ascertainability*: Class members can be readily ascertained from public copyright registries, Udio's records, digital identifiers, and other reliable public and private records. Additionally, widely available and reliable digital fingerprinting technologies, such as audio content identification systems, can efficiently identify class members' infringed recordings, making class administration manageable.

115. *Numerosity Rule 23(a)(1))*: The proposed classes consist of thousands of independent artists nationwide, including a significant number within Illinois, making the joinder of all members impracticable.

116. *Commonality (Rule 23(a)(2))*: Numerous questions of law and fact are common to all class members, and these common questions generate common answers resolving central issues for the entire class. These include, but are not limited to:

a. Whether Udio systematically acquired, copied, ingested, and used class members' copyrighted sound recordings and/or lyrics in its training and model-operation pipelines;

b. Whether Udio's copying, retention, and use of complete works during ingestion, training, and fine-tuning infringes the reproduction right under 17 U.S.C. § 106(1);

c. Whether Udio's fair-use defense applies to the alleged training and model-operation conduct under 17 U.S.C. § 107;

d. Whether Udio removed or altered Copyright Management Information (CMI) from class members' recordings and/or lyrics with the requisite knowledge or reason to know under 17 U.S.C. § 1202(b);

e. Whether Udio collected, stored, and commercially exploited class members' biometric identifiers (voiceprints) without obtaining informed consent under Illinois BIPA.

f. Whether Udio acted willfully, intentionally, or recklessly with respect to the challenged conduct;

g. Whether class-wide injunctive relief is appropriate to stop ongoing copying/ingestion, CMI removal/alteration, circumvention/trafficking, and unlawful use of biometric identifiers;

h. Whether Udio's unauthorized ingestion and storage of entire works violates § 106(1) even absent evidence of public-facing outputs;

i. Whether Udio's dissemination of datasets or copies to vendors, partners, or collaborators constitutes distribution "to the public" under § 106(3) or, in the alternative, supports reproduction liability; and whether "making available" suffices to plead or prove distribution;

j. Whether YouTube's rolling cipher, HTTPS tokening/HLS session keying, and DRM systems (e.g., Widevine/PlayReady/FairPlay) are "technological measures" that effectively control access to, or protect rights in, the works within the meaning of 17 U.S.C. § 1201, and whether any asserted fair-use defense applies to § 1201 claims;

k. Whether Udio provided or distributed false CMI in connection with outputs within the meaning of 17 U.S.C. § 1202(a) and with the requisite intent;

l. Whether Udio collected, captured, or obtained Illinois residents' voiceprints, without required policy, notice, and consent BIPA requires; whether violations accrue per-scan; and the applicable limitations period.

m. Whether Udio used Illinois residents' voices/identities for commercial purpose without consent within the meaning of IRPA, and whether IRPA claims are not preempted by the Copyright Act.

n. Whether Udio's marketing/positioning is likely to cause confusion or misunderstanding as to source, sponsorship, approval, or affiliation under the Illinois UDTPA (injunctive relief).

o. Whether Udio qualifies (or does not qualify) for DMCA § 512 safe-harbor protections for the conduct alleged;

117. *Typicality (Rule 23(a)(3))*: Plaintiffs' claims are typical of class members' claims. Plaintiffs and class members suffered identical harms from Udio's unauthorized and systematic copying, ingestion, and commercial exploitation. All claims arise directly from Udio's uniform, unlawful conduct.

118. *Adequacy of Representation (Rule 23(a)(4))*: Plaintiffs are independent artists whose interests are fully aligned with, and not antagonistic to, class members' interests. Plaintiffs retained experienced counsel skilled in complex copyright, DMCA, biometric privacy, and class action litigation.

Plaintiffs and counsel will vigorously prosecute this action and adequately represent class interests.

119. *Predominance and Superiority (Rule 23(b)(3))*: Common questions predominate over individual questions. Class-wide adjudication is efficient, fair, economical, and superior to individual litigation, which would be impractical, economically prohibitive, and risk inconsistent rulings. Class-wide adjudication is particularly appropriate because Udio's unauthorized copying and ingestion processes are automated, systematic, and identical across all class members, making individual factual inquiries unnecessary and impractical.

120. Statutory and other damages, although significant in aggregate, may individually be insufficient to justify costs associated with individual lawsuits, making class adjudication clearly superior.

121. *Injunctive Relief (Rule 23(b)(2))*: Udio acted on grounds applicable to the entire class, making injunctive and declaratory relief appropriate for the classes as a whole. Absent class-wide injunctive relief, Udio's unlawful conduct will continue, causing irreparable harm to Plaintiffs and all class members.

## **CLAIMS FOR RELIEF**

### **Count I**

### **Direct Copyright Infringement,<br>17 U.S.C. § 101 et seq.**

*Brought on behalf of the Copyright Class members*

122. Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth here.

123. Plaintiffs Woulard, ATS, and the Burjek Plaintiffs bring this claim individually and on behalf of all other Copyright Class members, for unauthorized reproduction, based on Udio's copying, storage, and use of entire works during pre-training, training, and fine-tuning.

124. Plaintiffs Woulard, ATS, and the Burjek Plaintiffs are the sole owners, co-owners, or exercise the exclusive control over the valid and enforceable copyrights in their sound recordings identified in this complaint. These Copyrighted Recordings are original, creative, fixed in tangible form, and properly registered with the U.S. Copyright Office.

125. Under 17 U.S.C. § 106, Plaintiffs and class members have the exclusive rights to reproduce, distribute, publicly perform, publicly display, and create derivative works based upon their Copyrighted Recordings.

126. Without authorization, Udio intentionally and systematically copied, ingested, and used these Copyrighted Recordings as part of its AI model training, and commercially exploited derivative outputs derived therefrom.

127. Udio's infringement extends beyond initial reproduction to retention, internal redistribution, and repeated re-use of Plaintiffs' Copyrighted Recordings in centralized corpora for engineering/non-training workflows. These ongoing reproductions are independent infringements.

128. Udio's commercial deployment of models built from those unlawful copies predictably substitutes for licensed uses across recognized markets, causing cognizable market harm even apart from any specific output match.

129. Independent of training, based on information and belief, Udio acquired, standardized, indexed, and retains full-fidelity copies of Plaintiffs' recordings (and lyrics) from unauthorized online sources, organized into an internal central library used for reference, evaluation, model-comparison, and post-training features (including remastering and style calibration), uses not necessary for model training. This pirated-library copying is not fair use.

130. Udio's infringement extends further, producing and distributing derivative AI-generated music directly derived from Plaintiffs' Copyrighted Recordings. These unauthorized derivative works compete with Plaintiffs' original recordings, undermining their commercial value and disrupting crucial licensing opportunities—opportunities that are particularly essential for independent artists.

131. Udio's infringement is deliberate and intentional. Udio and its investors openly admitted their intent to bypass licensing obligations, explicitly adopting a business strategy premised on intentional copyright infringement.

132. As a direct and proximate result of Udio 's ongoing infringement, Plaintiffs, especially independent artists, suffer substantial and irreparable harm, including lost licensing revenues, diminished market opportunities, damage to their professional reputations, and loss of critical control over their creative works.

133. Udio's infringement has been and continues to be willful and intentional, demonstrating reckless disregard for Plaintiffs' exclusive rights.

Udio was aware, or should have been aware, that its copying, ingestion, and use of the Copyrighted Recordings violated established copyright laws.

134. Unless enjoined by this Court, Udio's infringement will continue unabated, causing irreparable harm to Plaintiffs' economic and creative interests. Monetary damages alone are insufficient to fully redress the harm caused by Udio's ongoing infringement, necessitating injunctive relief to prevent continued violations.

135. Plaintiffs seek relief, including statutory damages (or alternatively actual damages and profits attributable to the infringement), attorneys' fees and costs, and injunctive relief pursuant to 17 U.S.C. §§ 502, 504, and 505.

**Count II**

**Direct Copyright Infringement (Distribution of Copyrighted Recordings, 17 U.S.C. §106(3))**

*Brought on behalf of the Copyright Class members*

136. Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–121 as though fully set forth here.

137. Plaintiffs Woulard, ATS, and the Burjek Plaintiffs and the Copyright Class own or exercise the exclusive control over the Copyrighted Recordings. Under 17 U.S.C. § 106(3), Plaintiffs have the exclusive right to distribute copies or phonorecords of their works to the public by sale or other transfer of ownership, or by rental, lease, or lending.

138. In addition to, and independent of, Udio's unauthorized reproduction of Plaintiffs' Copyrighted Recordings (Count I), Udio distributed or

caused to be distributed unauthorized copies of those works to third parties and the public, including by electronic transmission and remote provisioning that placed copies in the possession, custody, or control of non-Udio entities. Udio's infringement began with the unauthorized reproduction of Plaintiffs' and class members' Copyrighted Recordings during AI training and continues through retention, internal replication, and engineering re-use

139. On information and belief, without authorization, Udio transmitted, uploaded, provided, or otherwise made available copies of Plaintiffs' Copyrighted Recordings, and datasets and corpora containing them, to third parties in at least the following ways (each an act of distribution under § 106(3)):

a. *Third-party platform integrations*. In connection with commercial integrations with potential partners, Udio transmitted, provisioned, or otherwise caused copies of training and/or evaluation datasets containing Copyrighted Recordings to be accessible within those partners' environments and pipelines, or to be received and held by their personnel, systems, or managed infrastructure for integration, validation, and deployment purposes.

b. *External compute/storage vendors*. Udio transmitted and stored copies of Copyrighted Recordings with third-party cloud compute and storage providers (including hyperscale vendors) for training, fine-tuning, evaluation, staging, backup, and disaster-recovery workflows, thereby delivering copies to entities outside Udio for their operation and maintenance in the ordinary course of those services.

c. *Contractors, vendors, and collaborators*. Udio distributed copies to outside contractors, data labeling/evaluation vendors, research collaborators, and other Unknown Defendants who compiled, scraped, [or] obtained copyrighted sound recordings for inclusion in Udio's AI training data, including to facilitate preprocessing, curation, quality control, and model-evaluation tasks.

d. *Multi-entity data pipelines*. Udio seeded or replicated Copyrighted Recordings into shared, multi-entity data pipelines (e.g., external object stores, artifact registries, code/data repositories, or model-ops systems) accessible to non-Udio personnel, enabling those third parties to download, cache, shard, batch, or otherwise hold copies.

e. *Off-site replication and disaster recovery*. Udio caused additional distributions by replicating Copyrighted Recordings to off-site backup/disaster-recovery systems operated by third parties, including geo-replication that created and maintained additional copies in non-Udio facilities.

140. Each electronic transmission, upload, replication, provisioning, or third-party access enablement identified above constitutes a distinct distribution of Plaintiffs' Copyrighted Recordings "to the public" under § 106(3), regardless of whether Udio labeled such transfers as temporary, intermediate, encrypted, or for "testing," and regardless of subsequent deletion. For avoidance of doubt, "to the public" includes making copies available to multiple independent third parties—such as partners, vendors, contractors, or

collaborators—whether by transmission, remote provisioning, or placement into multi-entity data stores, notwithstanding labels like “temporary,” “encrypted,” or “testing.”

141. These distributions were commercial and willful, undertaken to accelerate product, scale Udio’s subscription platform, and secure competitive advantage and investment.

142. Plaintiffs allege distribution on information and belief where the specific recipients, transfer mechanisms, and volumes are peculiarly within Udio’s possession and those of its partners.

143. In the alternative, even if Udio’s dataset transfers were not ‘to the public,’ each transfer created at least one unauthorized reproduction (server-side copy, cache, shard, checkpoint), independently violating §106(1).

144. Reproduction and distribution are pleaded independently. Udio’s § 106(3) distribution infringements are pleaded as separate and additional to Udio’s § 106(1) reproduction infringements; distribution is not subsumed by reproduction in this Complaint.

145. Plaintiffs seek the same forms of relief as in Count I for each act of distribution, including statutory damages (or, in the alternative, actual damages and profits), attorneys’ fees and costs, and injunctive relief.

**Count III**

**Direct Copyright Infringement of Previously-Unregistered Recordings, 17 U.S.C. §101 et seq.**

*Brought on behalf of the Previously-Unregistered Copyright Class Members*

146. Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–121 as though fully set forth here.

147. Plaintiffs bring this claim individually and on behalf of the Previously Unregistered Copyright Class members, for unauthorized reproduction, based on Udio's copying, storage, and use of entire works during pre-training, training, and fine-tuning.

148. Plaintiffs and Subclass members own previously unregistered sound-recording copyrights ("Previously Unregistered Copyrighted Recordings") that Udio copied, ingested, trained on, and exploited. These recordings are original, creative, fixed in tangible form, and protected under 17 U.S.C. § 102(a) upon creation and fixation.

149. Plaintiffs and class members possess exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, publicly perform, publicly display, and create derivative works from their Previously Unregistered Copyrighted Recordings.

150. Without Plaintiffs' or class members' authorization, Udio intentionally and systematically copied, ingested, reproduced, distributed, and commercially exploited these Previously Unregistered Copyrighted Recordings by incorporating them into Udio's generative AI platform.

151. Udio's infringement began at the point of unauthorized copying of Plaintiffs' and class members' Previously Unregistered Copyrighted Recordings during AI training and continued with each subsequent AI-generated derivative work commercially exploited by Udio.

152. Independent of training, based on information and belief, Udio acquired, standardized, indexed, and retains full-fidelity copies of Plaintiffs' recordings (and lyrics) from unauthorized online sources, organized into an internal central library used for reference, evaluation, model-comparison, and post-training features (including remastering and style calibration), uses not necessary for model training. This pirated-library copying is not fair use.

153. Udio's unauthorized use has harmed, and continues to irreparably harm, Plaintiffs and the class by undermining licensing opportunities, diminishing the economic value of original recordings, and impairing their professional reputations.

154. Plaintiffs and the class are entitled to injunctive and declaratory relief, disgorgement of Udio's profits attributable to infringement, and actual damages incurred, pursuant to 17 U.S.C. §§ 502 and 504(b). For any work encompassed by this Count that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be deemed supplemented to include the relevant registration(s).

155. Plaintiffs expressly do not seek statutory damages or attorneys' fees under this count due to the unregistered status of these copyrights.

## Count IV

## Direct Copyright Infringement of Musical-Composition Lyrics, 17 U.S.C. §101 et seq.

*Brought on behalf of the Lyrics Copyright Subclass and Previously-Unregistered-Lyrics Subclass*

156. Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–121 as though fully set forth here.

157. Plaintiffs Woulard, ATS, and the Burjek Plaintiffs are the owners of valid and enforceable copyrights in the lyric compositions listed in Exhibit A (the "Copyrighted Lyrics"). Each is an original literary work fixed in a tangible medium and properly registered with the U.S. Copyright Office.

158. Under 17 U.S.C. § 106, Plaintiffs and class members hold the exclusive rights to reproduce, distribute, publicly perform, publicly display, and create derivative works based on their Copyrighted Lyrics.

159. Without permission, Udio intentionally and systematically copied, ingested, and stored the Copyrighted Lyrics, either in whole or substantial part, as training data (and subsequent fine-tuning data) for its music-generation models.

160. The first act of infringement occurred the moment Udio reproduced Plaintiffs' Copyrighted Lyrics in its training datasets. Every subsequent round of model training, updating, or fine-tuning that relied on those copies constitutes a separate, independently actionable infringement.

161. Udio's models routinely generate new lyric outputs—sometimes verbatim, sometimes with minimal cosmetic changes, other times echoing

distinctive phrasing, rhyme schemes, hooks, or narrative structures— that are derivative of Plaintiffs' Copyrighted Lyrics. These outputs are offered to paying users and compete directly with the original works in licensing, synchronization, streaming, and live-performance markets.

162. Udio's founders and investors have publicly acknowledged that they launched the product without licensing constraints, accepting the risk that unlicensed lyrics would drive model quality and market share.

163. As a direct and proximate result Udio's lyric-level infringement, Plaintiffs have suffered (and will continue to suffer) lost mechanical and synchronization fees, diminished publishing revenues, dilution of the market value of their catalogs, and loss of artistic control over how and where their lyrics appear.

164. Udio's conduct is willful and in reckless disregard of Plaintiffs' rights. Udio knew, or consciously avoided knowing, that copying entire lyric databases without a license violates the Copyright Act and standard music-publishing practices.

165. Unless enjoined, Udio will continue to copy, retain, and exploit Plaintiffs' Copyrighted Lyrics, causing irreparable harm that monetary damages alone cannot remedy.

166. Plaintiffs who own unregistered lyric copyrights seek only actual damages, Udio's profits attributable to the infringement, and injunctive relief under 17 U.S.C. § 504(b); they do not seek statutory damages or attorneys' fees for those unregistered works. For any lyrics encompassed by this paragraph

that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s).

**Count V**

**Direct Copyright Infringement of Musical-Composition Expression (Non-Lyric),**
**17 U.S.C. § 101 et seq.**

*Brought on behalf of the Musical-Composition (Non-Lyric) Registered and Previously-Unregistered Subclasses.*

167. Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–121 as though fully set forth here.

168. Plaintiffs (and/or their music-publishing affiliates or exclusive licensees) own valid, enforceable copyrights in musical compositions independent of lyrics, including protectable melodic, harmonic, and rhythmic expression and fixed arrangements, identified in Exhibit A (the "Copyrighted Musical Compositions (Non-Lyric)"). Each work listed in Exhibit A is an original work of authorship fixed in a tangible medium; where noted, the work is registered with the U.S. Copyright Office with an effective date of registration before the infringements alleged herein.

169. Under 17 U.S.C. § 106, Plaintiffs hold the exclusive rights to reproduce and distribute the Copyrighted Musical Compositions (Non-Lyric),

and to prepare derivative works (including but not limited to musical arrangements and orchestrations).

170. Without authorization, Udio intentionally and systematically copied and reproduced the Copyrighted Musical Compositions (Non-Lyric) as part of its training/fine-tuning pipeline. On information and belief, Udio: (i) ingested full-length sound recordings embodying Plaintiffs' compositions; (ii) performed audio-to-symbolic and audio-to-feature transformations to extract or infer melodic pitch-time sequences, chord progressions, harmonic rhythm/voice-leading, meter/tempo maps, groove patterns, arrangement/stem structure, and timbral/orchestration features; and (iii) fixed those representations in intermediate files, token sequences, spectrograms, embeddings, and model parameters retained for extended durations across training runs and model versions. Each such fixation constitutes an unauthorized reproduction under § 106(1).

171. The foregoing reproductions include complete or substantially complete non-lyric musical expression from Plaintiffs' compositions (e.g., distinctive motifs, hooks, chord-progression-plus-groove combinations, arrangement choices, and orchestration patterns), captured through Udio's batch processing, segmentation, and tokenization workflow alleged in the current complaint.

172. Plaintiffs' claims in this Count do not depend on current proof of public-facing outputs. Liability arises from unauthorized reproduction during ingestion, training and storage of Plaintiffs' musical-composition expression.

173. In the alternative, to the extent Udio's service outputs reproduce or are substantially similar to distinctive melodic/rhythmic motifs, hooks, chord-progression-plus-groove combinations, signature arrangement/orchestration choices, or other non-lyric expressive elements from Plaintiffs' compositions, such outputs constitute unauthorized derivative works under § 106(2) that compete in synchronization, production/library, performance, and other licensing markets.

174. On information and belief, Udio distributed or caused to be distributed copies or material portions/representations of Plaintiffs' non-lyric musical-composition expression (including datasets, feature matrices, token sequences, embeddings, and/or model checkpoints containing memorized composition content) to third-party vendors and infrastructure providers, and/or to collaborators and integration partners during development, testing, and deployment, each instance an additional violation of § 106(3).

175. Udio's infringement was willful. Udio and its investors publicly acknowledged launching and scaling "without licensing constraints," accepting litigation risk rather than seeking permission, thereby demonstrating knowledge of and reckless disregard for Plaintiffs' exclusive rights.

176. As a direct and proximate result of Udio's unauthorized reproductions (and, in the alternative, derivative outputs), Plaintiffs suffered and will continue to suffer harm, including loss of licensing revenues (e.g., composition dataset/training licenses, synchronization/production/library, performance, and arrangement-use fees), market dilution and substitution in

music-for-media and production/library markets, and loss of control over the integrity and presentation of their musical works.

177. For composition works in Exhibit A that are registered prior to infringement and those registered by members of the class prior to infringement, Plaintiffs seek statutory damages and attorneys' fees under 17 U.S.C. § 504(c) and § 505.

178. For composition works in Exhibit A that are unregistered and those that were unregistered by members of the class prior to infringement, Plaintiffs seek injunctive relief, actual damages, and disgorgement of Udio's profits attributable to the infringement under § 504(b), and will seek to amend to add statutory damages and fees for any such works that become registered consistent with 17 U.S.C. § 412. For any musical composition encompassed by this paragraph that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such composition unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s).

179. Monetary relief alone cannot redress Udio's ongoing reproduction of Plaintiffs' musical-composition expression in training corpora, intermediate representations, and model parameters. Plaintiffs therefore seek a permanent injunction prohibiting Udio from further copying, storing, using, or distributing Plaintiffs' non-lyric composition content (including associated

features/embeddings/parameters), and requiring deletion/purge of all copies and derivatives containing Plaintiffs' composition material from Udio's systems, vendors, and collaborators.

180. Plaintiffs incorporate by reference their DMCA § 1202 allegations regarding removal/alteration of CMI to the extent Udio stripped composer/publisher identifiers from composition sources used to build lyric-independent composition datasets or feature sets; and Plaintiffs' BIPA allegations to the extent Udio's training captures and reproduces distinctive vocal style elements inseparable from composition arrangements.

## Count VI

## Removal or Alteration of Copyright Management Information, 17 U.S.C. §1202(b)

*Brought on behalf of DMCA Subclass, Lyrics Copyright Subclass, Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously Unregistered Subclasses*

181. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

182. Plaintiffs, including the DMCA Subclass, Lyrics Copyright Subclass, Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously-Unregistered Subclasses, bring this claim under 17 U.S.C. § 1202(b).

183. Udio intentionally removed and/or altered CMI embedded in both (i) sound-recording files and (ii) lyric-text files during the copying, conversion, and segmentation of those works for AI training. The stripped-or-modified CMI includes, by way of example, song titles, songwriter and performer names,

publishers, ISRC and ISWC codes, embedded watermarks, and copyright notices, all of which identify rightful ownership and licensing terms.

184. Plaintiffs' Copyrighted Recordings include embedded CMI, such as artist names, track titles, album details, producer and engineer credits, copyright notices, licensing restrictions, and unique identifying information, in metadata formats such as ID3 tags, embedded watermarks, and other audio file headers.

185. This embedded CMI plays a critical role in identifying Plaintiffs' works, safeguarding ownership, enabling proper licensing, and protecting their economic and creative rights in the music marketplace.

186. On information and belief, Udio intentionally and systematically removed, altered, or obscured Plaintiffs' CMI from sound recordings when Udio copied, converted, standardized, segmented, and ingested these recordings into its AI training datasets. Such removal and alteration stripped Plaintiffs' recordings of essential identifying information, severing critical attribution to Plaintiffs.

187. Udio knew or had reason to know that removing or altering Plaintiffs' CMI would facilitate or conceal its unauthorized copying and infringement. Given the vast scale, sophisticated methods, and intentional nature of Udio's conduct, Udio's removal and alteration of CMI was deliberate, willful, and purposeful.

188. Udio further disseminates outputs from its generative AI that frequently contain identifiable audio signatures originally embedded as CMI,

such as distinct artist identifiers, but stripped of their original context or attribution. This intentional misappropriation causes confusion regarding the true source and ownership of the resulting AI-generated works and obscures the underlying infringement of Plaintiffs' rights.

189. Each individual removal, alteration, or distribution of Plaintiffs' recordings stripped of CMI constitutes a separate violation of 17 U.S.C. § 1202(b). Given Udio's ingestion and alteration of tens of millions of recordings, including substantial numbers of Plaintiffs' works, the scope and volume of violations are immense.

190. Udio is not entitled to any of the safe harbor protections under 17 U.S.C. §512. Unlike passive service providers, Udio actively and intentionally copied, ingested, and manipulated Plaintiffs' sound recordings and associated CMI. Udio's AI platform is not a passive conduit or hosting service. It's a sophisticated, active commercial system designed to copy, alter, and distribute copyrighted works without authorization or attribution. As such, Udio cannot credibly claim the protection of the safe harbors provided by Section 512.

191. Plaintiffs have suffered, and continue to suffer, substantial and irreparable harm from Udio's deliberate removal and alteration of CMI. This harm includes significant loss of licensing opportunities, reduced market value of Plaintiffs' works, diminished control over their creative output, and harm to Plaintiffs' professional reputations and standing in the marketplace.

192. Unless restrained by the Court, Udio's unlawful conduct will continue, causing Plaintiffs ongoing irreparable harm for which monetary

damages alone are inadequate. Immediate and permanent injunctive relief is therefore necessary to halt Udio's ongoing violations.

193. Plaintiffs seek relief under 17 U.S.C. §§ 1203 and 1202(b), including statutory damages for each separate act of CMI removal or alteration, attorneys' fees, litigation costs, and injunctive relief sufficient to fully address and halt Udio's unlawful practices.

**Count VII**

**Circumvention of Access Controls, DMCA § 1201**

*Brought on behalf of the § 1201 Anti-Circumvention Subclass*

194. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

195. The Digital Millennium Copyright Act prohibits (i) circumvention of a technological measure that effectively controls access to a copyrighted work, 17 U.S.C. § 1201(a)(1); (ii) manufacturing, importing, providing, or otherwise trafficking in technology, products, services, devices, or components that are designed for, have limited commercially significant purpose other than, or are marketed for circumventing access controls, § 1201(a)(2); and (iii) trafficking in technology, products, services, devices, or components that are designed for, have limited commercially significant purpose other than, or are marketed for circumventing copy-control measures that protect rights under Title 17, § 1201(b)(1).

196. On information and belief, during the Class Period Udio and/or its data vendors and agents acquired vast volumes of commercially released

recordings by bypassing or defeating stream-protection and download-prevention technologies widely deployed by rightsholders and licensed platforms, including but not limited to cryptographic signature schemes and rolling ciphers used to prevent direct downloads (e.g., YouTube's rolling cipher), HTTPS tokening/HLS AES-128 session keying, and digital rights management systems such as Widevine, PlayReady, and FairPlay, which are technological measures that, in the ordinary course of their operation, require the application of information, processes, or treatments authorized by the copyright owner to gain access to the underlying audio files. For example, Udio avoided, bypassed, removed, deactivated, and/or impaired YouTube's rolling cipher by running signature-decoding routines and other code to generate unauthorized requests to the protected media endpoints.

197. On information and belief, Udio circumvented these technological measures, without the authority of copyright owners, by "avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing]" them to obtain decrypted or otherwise unprotected copies for ingestion and training, including by deploying or procuring automated ripping/scraping utilities and decryption routines capable of resolving platform ciphers, session keys, or DRM to extract raw audio. 17 U.S.C. § 1201(a)(3)(A). For example, the authorized YouTube player computes an ephemeral, cipher-derived signature for each request to the media endpoints (including segmented streams). Without that computation, the content data is not returned. Udio's stream-ripping code reproduced this computation outside the authorized player to obtain the protected data. Udio's

own pipeline then converted the resulting files to raw, metadata-free formats for storage and batch, confirming the end-to-end purpose of obtaining unprotected access at scale.

198. On information and belief, Udio manufactured, adapted, integrated, and/or procured technologies, products, services, devices, or components (including custom scripts, modules, and ingest services) that are primarily designed for circumvention of platform access controls and/or copy controls; that have no or only limited commercially significant purpose other than circumvention; and/or that were provided, supplied, or used by Udio and its data vendors for circumvention, all in violation of §§ 1201(a)(2) and (b)(1). These tools/services enabled the reproduction of decrypted audio files, their conversion to raw formats, and subsequent storage and reuse in Udio's training data lake.

199. On information and belief, Udio also procured or coordinated with third-party "ripper" services or vendors (presently named as Unknown Defendants) that trafficked in circumvention technologies and provided Udio with decrypted audio at scale, or with turnkey services to defeat access controls on licensed platforms and digital storefronts, thereby facilitating Udio's mass reproduction of protected works.

200. As further alleged in Count VI, Udio's ingestion pipeline removed or altered CMI and segmented files to anonymize origins, thereby concealing and facilitating the underlying anti-circumvention and downstream copying. The reproduction of audible watermarks in Udio's outputs is consistent with

copying from decrypted sources rather than clean stems, further corroborating circumvention at ingestion.

201. Udio's conduct was knowing and willful. Its investors publicly admitted Udio chose to proceed "without the constraints" of licensing, and Udio refuses to disclose its training data. No statutory exemption applies: Udio's activities are not nonprofit library/archival uses, interoperability reverse-engineering, encryption research, or security testing; they are commercial, large-scale data acquisition for a for-profit generative-AI service.

202. These anti-circumvention violations are independent of any underlying infringement liability, and "fair use" is not a defense to § 1201 circumvention or trafficking claims.

203. Udio's violations caused and continue to cause irreparable harm, including loss of control over access to Plaintiffs' works, facilitation of unlicensed reproductions used to train Udio's models, impairment of licensing markets, and concealment of copying through removal of CMI, all at industrial scale.

204. Under 17 U.S.C. § 1203, Plaintiffs and the § 1201 Subclass seek: (a) permanent injunctive relief prohibiting further circumvention and trafficking; (b) impoundment and destruction of any circumvention technologies, devices, components, scripts, or services in Udio's possession, custody, or control, and deletion of any decrypted copies obtained via circumvention; (c) statutory damages of not less than $200 and not more than $2,500 per act of circumvention, access, or trafficking in violation of § 1201,

and/or actual damages and profits, as the Court deems just; (d) costs and reasonable attorneys' fees; and (e) any other relief the Court deems proper.

**Count VIII**

**False Copyright Management Information (DMCA § 1202(a))**

*Brought on behalf of the DMCA Subclass, Copyright Class, the Unregistered Copyright Class, the Lyrics Copyright Subclass, the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously-Unregistered Subclasses*

205. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

206. The Digital Millennium Copyright Act ("DMCA") prohibits any person from knowingly and with the intent to induce, enable, facilitate, or conceal infringement: "(1) provid[ing] copyright management information that is false; or (2) distribut[ing] or import[ing] for distribution copyright management information that is false." 17 U.S.C. § 1202(a).

207. "Copyright management information" ("CMI") includes, inter alia: (a) the title and other identifying information for a work, (b) the name of the author, (c) the name of the copyright owner, (d) terms and conditions for use of the work, and (e) identifying numbers or symbols referring to such information, when conveyed in connection with copies or phonorecords of a work. 17 U.S.C. § 1202(c).

208. On information and belief, Udio provides and distributes false CMI in multiple, independent ways, including but not limited to:

a. Udio embeds digital watermarks within the generated music, using unique interactions between instruments, dynamics, and spatial placement to

create a unique signature that identifies Udio as the source of the digital file. While such watermarks are not a simple visual watermark, the technology is designed to be detectable by Udio or other systems, even if attempts are made to alter the audio.

b. Attribution lines and author/owner credits affixed to Udio output pages and share cards that label AI-generated tracks as "by" the Udio account handle of the prompting user (e.g., "by [username]"), thereby falsely identifying that user as the author and/or owner of the underlying musical work and sound recording when the output contains protected expression extracted or reproduced from Plaintiffs' works. These attribution lines are displayed on output file pages and share artifacts in connection with the copies/phonorecords themselves, thereby conveying CMI 'in connection with' the works within the meaning of 17 U.S.C. §1202(c).

c. Ownership claims Udio assigns to users by default, as reflected in Udio's own help center: Udio states a user is considered the owner of the song that user creates, but free-tier outputs must also include an attribution to Udio. Udio encourages commercial exploitation by users. When those outputs incorporate protected expression from Plaintiffs' recordings or lyrics, Udio's owner/author designations are false CMI that it provides and distributes in connection with the works.

d. False or misleading terms-of-use indicators conveyed with outputs (e.g., labeling outputs as owned by the user or by Udio; indicating broad commercial rights) that contradict the rights of Plaintiffs in the incorporated

expression and thus constitute false CMI regarding "terms and conditions for use."

209. As already alleged, Udio's training pipeline removes and disassociates genuine CMI (e.g., ID3 tags, embedded credits, audible watermarks) from Plaintiffs' recordings and lyrics and then distributes outputs devoid of that CMI. Udio simultaneously substitutes its own or its users' identifiers and ownership labels (webpage "by" lines, ownership statements for paid users, and Udio's claimed ownership of basic/free outputs), thereby providing "false CMI" in connection with those outputs.

210. Udio knew the CMI it provided and distributed was false. Udio: (i) publicly represents that own outputs even though Udio designed its system to ingest and reproduce protected elements of existing recordings and lyrics; (ii) removed authentic CMI during ingestion to frustrate traceability; and (iii) deployed the platform at commercial scale with knowledge that outputs would be labeled as authored/owned by someone other than the true rightsholders.

211. Udio acted "with the intent to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a). Udio's false "author/owner" designations and commercialization messaging are designed to (and do) induce and enable wide distribution and monetization of outputs, to conceal that Plaintiffs' protected expression was copied during training, and to frustrate licensing and attribution markets by misdirecting content-ID systems and downstream licensees.

212. Each instance in which Udio: (a) displays a Udio output page or share card with "by [username]"; (b) communicates that Udio or the user is the owner of a track that incorporates Plaintiffs' protected expression; (c) reproduces third-party producer tags or similar identifiers suggesting false authorship; or (d) distributes such outputs through Udio's site, APIs, apps, or partner integrations, constitutes a separate violation of § 1202(a).

213. Udio's violations are willful. Udio launched and scaled its platform while acknowledging copyright disputes were an expected by-product; it intentionally removed authentic CMI and replaced it with its own/user CMI to grow usage and revenue, despite obvious risks to rightsholders.

214. As a direct and proximate result, Plaintiffs and Class members suffered and will continue to suffer harm, including market confusion, lost or impaired licensing opportunities, dilution of attribution value, misdirection of content-ID and royalty systems, and the concealment of underlying infringements. Monetary relief alone is inadequate.

215. Plaintiffs seek all remedies available under 17 U.S.C. § 1203, including: (a) statutory damages for each act of providing or distributing false CMI; (b) permanent injunctive relief enjoining Udio from providing or distributing false CMI and requiring corrective measures (including reasonable technical means to attach accurate CMI, corrective notices on Udio output pages, and best-efforts notices to major distributors/partners to correct false CMI already disseminated); (c) disgorgement of profits attributable to false-CMI

conduct; (d) costs and attorneys' fees; and (e) any further relief the Court deems just and proper.

## Count IX

## Contributory Copyright Infringement, Sound Recordings and Lyrics, 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class, the Unregistered Copyright Class, the Lyrics Copyright Subclass, the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered Subclass, and Musical-Composition (Non-Lyric) Unregistered Subclass*

216. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

217. Plaintiffs bring this claim individually and on behalf of the Copyright Class, the Previously Unregistered Copyright Class, the Lyrics Copyright Subclass, the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered Subclass, and Musical-Composition (Non-Lyric) Previously-Unregistered Subclass.

218. Third parties have directly infringed Plaintiffs' exclusive rights by reproducing, preparing derivative works from, distributing, publicly performing, and/or displaying works that copy protected expression from Plaintiffs' sound recordings and lyrics without authorization:

a. End-users of Udio's platform who, using Udio's models and interfaces, generate, fix, and disseminate AI-created audio files and lyrics that are substantially similar to Plaintiffs' protected works, and then upload, stream, synchronize, or otherwise distribute those files on platforms such as YouTube, TikTok, Spotify, Instagram, and SoundCloud.

b. Data suppliers and compilers (Unknown Defendants) who reproduced and distributed Plaintiffs' recordings and lyrics to Udio for ingestion into training and fine-tuning datasets without license or permission.

c. Technology and distribution partners who, at Udio's direction or with Udio's material assistance, reproduce and distribute infringing outputs through integrated channels, thereby making such outputs available to the public.

219. Udio had actual knowledge that its platform and datasets were being used for infringement (and, at minimum, was willfully blind):

a. Udio publicly acknowledged training on existing copyrighted music while invoking "fair use," demonstrating knowledge that unlicensed copying had occurred.

b. A lead investor and Udio's CEO admitted Udio needed to make this product without the constraints of licensing, confirming awareness that Udio approach would drive infringement.

c. Udio refuses to identify the contents and provenance of its training data, labeling it "confidential," despite recurring public reports of outputs echoing recognizable protected elements, facts that put Udio on notice of ongoing infringements by users and data suppliers.

220. Udio also had constructive knowledge and was willfully blind because (i) its own pipeline intentionally strips and slices CMI from training inputs (making provenance detection harder), (ii) it is aware of overfitting and

memorization risks, and (iii) it scaled commercial features that predictably yield infringing outputs.

221. Udio materially contributes to third-party infringement by providing the instruments and services that are the but-for technological cause of the infringements and by taking affirmative steps that facilitate and amplify them:

a. *Supplying the means*: Udio provides the models, servers, and interfaces that generate, fix, and deliver the infringing copies; absent Udio's systems, the specific files at issue would not exist.

b. *High-volume commercialization*: Udio's paid tiers allow massive daily generation and grant commercial use, encouraging users to create and monetize outputs that substitute for Plaintiffs' works.

c. *Enhancement tools that increase substitutability*: Features in the Udio product make outputs more market-ready and more likely to mimic distinctive, protectable expression.

d. *Integrated distribution*: Udio's integrations reduce friction to public dissemination, materially assisting the reproduction and distribution of infringing outputs.

e. *CMI removal and provenance obfuscation*: Udio's intentional removal/alteration of CMI and audio/text anonymization (ID3/title/artist/publisher/ISRC/ISWC removal; segmentation) foreseeably facilitates infringement by concealing ownership and frustrating rights-management.

f. *Failure to implement effective safeguards despite knowledge*: With awareness of overfitting and near-verbatim regeneration risks, Udio failed to deploy or enforce effective guardrails to prevent outputs substantially similar to Plaintiffs' recordings or lyrics.

222. Independently and additionally, Udio intentionally induces infringement. Udio's public messaging and product design show an objective of promoting infringing uses: marketing high-quality tracks ready for mainstream airplay, releasing tools to create persistent voices, offering commercial-use tiers that scale with output volume, and integrating rapid distribution channels—while eschewing licensing constraints.

223. On information and belief, Udio end-users have generated outputs that copy protectable elements of Plaintiffs' works (including distinctive melodies, hooks, riffs, rhythmic figures, chord progressions arranged in a protectable selection/sequence, and lyric lines/phrases), and have uploaded and monetized those outputs on third-party platforms without authorization.

224. Udio's conduct is a but-for and proximate cause of the third-party infringements. The infringements occurred through, and because of, Udio's models, interfaces, product features, pricing, and integrations.

225. Udio is not entitled to DMCA safe-harbor protections for the conduct alleged: it is not merely a passive host storing material at a user's direction; it actively creates, manipulates, and disseminates the content and intentionally removes/obscures CMI (as separately alleged. This claim arises independently of, and in addition to, Udio's direct and DMCA violations.

226. As a direct and proximate result of Udio's contributory infringement and inducement, Plaintiffs and the Classes have suffered and will continue to suffer irreparable harm and damages, including (without limitation) lost licensing revenue and opportunities, market substitution and dilution, harm to catalog value, and loss of control over the presentation and integrity of their works.

227. Plaintiffs seek all remedies available under the Copyright Act, including but not limited to: (i) preliminary and permanent injunctive relief enjoining Udio from materially contributing to or inducing infringement and requiring implementation of effective guardrails (including provenance logging, dataset segregation/deletion of unlicensed materials, CMI restoration, and output-filtering that blocks near-verbatim/regenerations of protected melodies, lyrics, and distinctive elements); (ii) statutory damages for registered works, or, in the alternative, actual damages and Udio's profits; (iii) costs and attorneys' fees; and (iv) any further relief the Court deems just and proper. With respect to any United States works encompassed by this Count that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act as to any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s). Nothing in this paragraph limits claims as to works that are not "United States works" within the meaning of 17 U.S.C. § 411(a).

## Count X

## Vicarious Copyright Infringement, Sound Recordings and Lyrics, 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class, the Unregistered Copyright Class, the Lyrics Copyright Subclass, and the Previously-Unregistered-Lyrics Subclass*

228. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

229. This Count is brought by Plaintiffs individually and on behalf of the Copyright Class, the Previously Unregistered Copyright Class, the Lyrics Copyright Subclass, and the Previously-Unregistered-Lyrics Subclass.

230. Plaintiffs and the Classes own or control the exclusive rights under 17 U.S.C. § 106 in the sound recordings and musical-composition lyrics identified in Exhibit A (and additional works to be identified in discovery), including the rights to reproduce, prepare derivative works from, distribute, and publicly perform their works.

231. In addition to directly infringing and contributing to infringement as alleged elsewhere, Udio is vicariously liable for copyright infringement by third parties, including but not limited to: (i) Udio's users who, through Udio's platform, generate, copy, distribute, publicly perform, and commercially exploit AI-generated audio that is derivative of, substantially similar to, or otherwise infringes Plaintiffs' works; and (ii) Udio's contractors, vendors, data partners, and other Unknown Defendants who scraped, copied, supplied, processed, or prepared Plaintiffs' works for Udio's training, fine-tuning, evaluation, filtering, or commercialization pipelines.

232. At all relevant times, Udio had, and exercised, the right and ability to supervise and control the infringing activity carried out through its service and by third parties acting for its benefit. Among other things, Udio: (a) exclusively operates, configures, and maintains the servers, models, and interfaces that generate the infringing audio; (b) designs, selects, and updates the training and fine-tuning corpora and model guardrails; (c) implements (or chooses not to implement) prompt and output filters capable of preventing generation of infringing outputs; (d) sets and enforces usage rules, credit limits, and content policies; (e) can identify, block, rate-limit, or suspend users and specific prompts/outputs; (f) curates, promotes, and upgrades outputs that it determines will be available and in what form; and (g) controls third-party integrations (e.g., via APIs) through which infringing outputs are generated and disseminated. Udio's ability to prevent or limit the infringing activity, coupled with its failure to do so, satisfies the supervisory-control element.

233. With respect to third-party data suppliers, contractors, or vendors (the Unknown Defendants), Udio likewise possessed the contractual right to monitor, direct, accept, reject, or require re-processing of the data and code those entities acquired or prepared for Udio's training pipelines, as well as the right to terminate or modify those relationships. Udio's oversight and acceptance of training data and processing work, despite their infringing nature, further establishes Udio's right and ability to supervise the underlying infringement.

234. Udio also received a direct financial benefit from the infringing activity. Udio's revenues and enterprise value scale with the volume, virality, and commercial utility of outputs generated and shared by users, including outputs that are derivative of or substantially similar to Plaintiffs' works. By: (a) offering tiered, usage-based subscriptions that monetize each batch of outputs; (b) marketing Udio as a frictionless alternative to licensed music creation and synchronization; (c) enabling commercial exploitation of AI-generated audio; and (d) expanding distribution through high-exposure integrations, Udio attracts and retains paying users specifically because its system can generate music that substitutes for, or trades on, Plaintiffs' protected expression. The availability of infringing outputs thus draws users, increases engagement and upgrades, and fuels revenue and valuation, conferring a direct financial benefit that is causally tied to the infringing activity.

235. Udio's internal product choices (e.g., longer song durations; more realistic vocals) and growth marketing campaigns are designed to heighten output fidelity and recognizability, thereby increasing the substitutability of those outputs for licensed music and enhancing Udio's commercial appeal. Udio's investors and executives have publicly acknowledged that operating without licensing constraints was a deliberate strategy to accelerate product quality and growth—underscoring that infringement-driven capabilities and usage were material drivers of Udio's financial success.

236. By virtue of the foregoing, Udio is vicariously liable for the infringing acts of its users and of third parties acting for its benefit. Udio had

the right and ability to supervise and control the infringement and received a direct financial benefit from it.

237. Udio's conduct was and is willful and undertaken in reckless disregard of Plaintiffs' rights.

238. Plaintiffs and the Classes are entitled to all remedies available under the Copyright Act, including injunctive relief (17 U.S.C. § 502), statutory damages for registered works (17 U.S.C. § 504(c)), or, in the alternative, actual damages and Udio's profits attributable to the infringement (17 U.S.C. § 504(b)), costs and attorneys' fees (17 U.S.C. § 505), and such other and further relief as the Court deems just and proper. With respect to any "United States works" encompassed by this Count that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act as to any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be deemed automatically supplemented to include the relevant registration(s). Nothing in this paragraph limits claims as to works that are not "United States works" within the meaning of 17 U.S.C. § 411(a).

## Count XI

## Violation of Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.

*Brought on behalf of the Illinois Biometric Information Privacy Act Subclass*

239. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

240. Plaintiffs Woulard and the Burjek Plaintiffs bring this claim individually and on behalf of all other Illinois Biometric Information Privacy Act Subclass members.

241. The Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS § 14/1 et seq., regulates the collection, use, storage, and dissemination of biometric identifiers, including "voiceprints," and prohibits private entities from collecting or using biometric data without explicit, informed written consent.

242. The claims in this Count XI seek protection of Plaintiffs' unique biometric privacy rights under Illinois law, distinct and qualitatively different from rights granted under federal copyright law. BIPA safeguards personal biometric information independently from rights relating to the reproduction or distribution of creative works.

243. Certain Plaintiffs are residents of Illinois, have recorded music or distinctive vocal tags clearly identifiable as their own voices, and therefore possess protectable biometric identifiers as defined by BIPA. These voiceprints serve as unique biometric identifiers that can reliably distinguish Plaintiffs from other individuals.

244. On information and belief, Udio systematically collected, captured, copied, and stored Plaintiffs' distinctive biometric identifiers, including recognizable voiceprints or artist voice tags, when ingesting Plaintiffs' sound recordings into its generative AI training datasets. For each Illinois Plaintiff, Udio computed and stored speaker-embedding vectors—fixed-length numerical templates derived from spectral features that uniquely identify the individual

across recordings. These voiceprints permit re-identification and are biometric identifiers under 740 ILCS 14/10. Udio captured, stored, and used these voiceprints without the written policies and informed consent BIPA requires.

245. These embeddings are biometric identifiers under BIPA, not mere audio. Each scan/capture is a separate violation.

246. For Illinois residents whose voices were captured, the capture and resulting injuries occurred primarily and substantially in Illinois.

247. Udio never obtained Plaintiffs' consent, let alone the informed written consent explicitly required by BIPA, to collect, capture, store, or otherwise use Plaintiffs' biometric identifiers. Plaintiffs were never informed about the specific purpose, duration, or terms regarding Udio's use and storage of their voiceprints.

248. Upon information and belief, Udio retains Plaintiffs' biometric identifiers indefinitely within its AI training data and subsequent generative outputs. Udio's continued use and storage of Plaintiffs' biometric data without consent directly violates 740 ILCS §§ 14/15(a) and 14/15(b).

249. Udio failed to develop, publicly disclose, and comply with a written retention schedule and guidelines for permanent destruction as required by 740 ILCS 14/15(a).

250. Udio further commercially exploits these biometric identifiers by generating AI music outputs that clearly reproduce Plaintiffs' distinctive voices, vocal signatures, or artist tags. These outputs, publicly accessible through

Udio's commercial platform, distribute Plaintiffs' biometric identifiers widely without Plaintiffs' consent, violating 740 ILCS 14/15(c) and (d).

251. By systematically collecting, storing, using, and commercially disseminating Plaintiffs' biometric voiceprints without consent or notice, Udio has recklessly or intentionally violated multiple provisions of BIPA. Given Udio's sophistication and public acknowledgments of the lack of licensing agreements or consents, its conduct was knowing and deliberate, or at a minimum, reckless.

252. Udio profited from the collection, capture, storage, and use of Plaintiffs' biometric identifiers (voiceprints) by embedding them in model parameters and internal corpora to create and sell AI music services, conduct prohibited by 740 ILCS 14/15(c), and disclosed biometric identifiers to employees/contractors and partners through access to retained corpora and evaluation artifacts in violation of 740 ILCS 14/15(d).

253. Plaintiffs have suffered, and continue to suffer, substantial and irreversible harm as a result of Udio's unlawful collection, storage, dissemination, and commercial exploitation of their biometric identifiers. This harm includes the loss of control over highly personal biometric data, increased risk of identity misuse, dilution of their personal and professional identities, diminished licensing opportunities, and ongoing threats to their privacy and autonomy as artists.

254. Under BIPA, Plaintiffs seek statutory damages of $5,000 for each intentional or reckless violation (or alternatively $1,000 per negligent violation),

injunctive relief requiring Udio to delete Plaintiffs' biometric data and cease any further use or dissemination, and reimbursement of attorneys' fees and litigation expenses, pursuant to 740 ILCS 14/20.

## Count XII

## Violation of Illinois Right of Publicity Act (IRPA), 765 ILCS 1075/1 et seq.

*Brought on behalf of the Illinois Right of Publicity Act Subclass*

255. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

256. Plaintiffs Woulard and the Burjek Plaintiffs (the “IRPA Plaintiffs”) bring this Count individually and on behalf of the Illinois Right of Publicity Act Subclass (the “IRPA Subclass”).

257. IRPA recognizes each individual's right “to control and to choose whether and how to use [their] identity for commercial purposes,” and prohibits using an individual's identity for a commercial purpose during their lifetime without prior written consent. “Identity” includes, without limitation, a person's name, signature, photograph, image, likeness, and voice; “commercial purpose” includes use in advertising or promoting products or services, or on/within products or services.

258. Udio used IRPA Plaintiffs' and IRPA Subclass members' identities, including their voices and distinctive vocal attributes, for commercial purposes without written consent. Udio did so by:

a. Training and fine-tuning its models on recordings embodying plaintiffs' uniquely identifiable voices, thereby capturing and modeling their vocal identities; and

b. Generating and disseminating outputs that replicate or closely simulate plaintiffs' distinctive voices, vocal timbre, tags, or other identifiers, and using those outputs, and the ability to generate them, to market, promote, and sell Udio's subscription service, and to drive paid tiers.

259. Udio knew or should have known the voices and vocal signatures in Plaintiffs' recordings are core components of "identity" under IRPA and that exploiting those attributes for advertising, promotion, and monetization required prior written consent.

260. Udio did not obtain IRPA Plaintiffs' or IRPA Subclass members' written consent to use their identities for any commercial purpose.

261. Udio's commercial uses included, inter alia, advertising and promoting Udio's AI product and paid tiers; driving subscription sales by highlighting the service's capacity to generate human-sounding vocals; and encouraging public dissemination of outputs on platforms such as YouTube, TikTok, Instagram Reels, and Spotify, all to increase Udio's revenue and market share.

262. IRPA protects identity-based rights (name/voice/likeness), which are distinct from rights protected by the Copyright Act.

263. Udio's use of identities to promote and sell its service is classic commercial use not immunized by the First Amendment. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518–22 (7th Cir. 2014).

264. Udio's conduct is not news, public affairs, or a noncommercial account of public interest; it is the sale, advertising, and promotion of a for-profit AI music service.

265. As to IRPA Plaintiffs and the IRPA Subclass, the challenged uses and injuries occurred primarily and substantially in Illinois: Udio marketed and sold subscriptions in Illinois, ingested and exploited Illinois artists' voices, and disseminated voice-simulative outputs to and within Illinois.

266. Udio's violations were willful and reckless. Udio and its investors publicly acknowledged launching and scaling "without licensing constraints," while touting human-like vocals and rapid commercial growth—facts corroborating intentional commercial use of identity without consent.

267. IRPA Plaintiffs and the IRPA Subclass suffered and continue to suffer injuries, including loss of control over their identities, dilution and commodification of their voices, reputational harm, and economic losses (including diversion of licensing value in their personas and diminished market for authentic performances).

268. Udio's violations are ongoing and continuing: each new training pass, model update, marketing use, and distribution of voice-simulative outputs within the limitations period constitutes a fresh IRPA violation;

discovery has been impeded by Udio's refusal to disclose training data and sources, warranting tolling and/or the discovery rule as appropriate.

## Count XIII

## Violation of Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 et seq. (Injunctive Relief)

*Brought on behalf of the Illinois UDTPA Subclass*

269. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

270. Plaintiffs and class members are engaged in trade and commerce in Illinois and nationwide by creating, licensing, and selling music, sound recordings, and lyrics. Udio conducts substantial business in Illinois and directs its marketing and services into this District. Udio's challenged practices occurred "in the course of business" and affect commerce within Illinois.

271. The UDTPA prohibits deceptive trade practices, including: passing off goods or services as those of another; causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; causing likelihood of confusion as to affiliation, connection, or association with another; representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade if they are of another; and engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2(a)(1)–(3), (5), (7), (12).

272. In the course of its business, Udio has engaged in deceptive trade practices within the meaning of 815 ILCS 510/2 by, among other things:

a. *Passing off/sponsorship & approval*: designing, training, and promoting a system that generates recordings "indistinguishable from human-created music" and that reproduce distinctive artist identifiers (e.g., producer/artist tags), thereby creating a likelihood of confusion that AI outputs are authorized by, affiliated with, sponsored by, or approved or certified by the real artists and rights-holders whose identities and recordings Udio leveraged.

b. *"Original/royalty-free/commercial-ready" claims*: marketing and enabling commercial exploitation of Udio outputs as "original" or otherwise suitable for downstream commercial use while omitting or obscuring material facts about (i) Udio's ingestion of unlicensed works to build the system and (ii) the risk of confusion, affiliation, and rights encumbrances that follow. These representations misstate the characteristics and benefits of Udio's goods/services and are likely to mislead users, licensees, platforms, and the public.

c. *Affiliation/association*: deploying and integrating Udio's system into mainstream consumer channels in a manner that reinforces the mistaken impression that outputs are endorsed by, affiliated with, or derived from licensed catalogs or living artists, when they are not.

d. *Quality/standard misrepresentation*: representing outputs as high-quality and "indistinguishable from human" while simultaneously relying on unlicensed ingestion and replication of distinctive artist expression and voice

identifiers that foster market confusion regarding origin and authorship and blur the line between genuine artist recordings and Udio outputs.

273. These practices are likely to cause confusion among consumers, licensees, platforms, distributors, and the public as to the source, sponsorship, approval, or affiliation of Udio outputs, and as to whether Udio has obtained appropriate licenses or approvals from the artists and rights-holders whose identities and copyrighted recordings Udio leveraged.

274. Plaintiffs and class members are persons "likely to be damaged" by Udio's deceptive trade practices within the meaning of 815 ILCS 510/3. Among other harms: confusion diverts demand, depresses licensing prices, impairs brand/artist goodwill, and undermines the integrity and provenance of Plaintiffs' works and identities.

275. No actual damages need be proven for UDTPA injunctive relief, and proof of actual confusion is not required; a likelihood of confusion or likelihood of damage suffices under 815 ILCS 510/3.

276. This claim is not preempted by the Copyright Act, 17 U.S.C. § 301, because it requires extra elements—deceptive conduct and likelihood of confusion as to source, sponsorship, approval, affiliation, and product characteristics—that are qualitatively different from the exclusive rights protected by copyright. Plaintiffs seek injunctive and ancillary equitable relief tailored to prevent marketplace deception, not to vindicate mere rights of reproduction or distribution.

277. Udio's deceptive trade practices were and are willful. Udio and its investors publicly acknowledged a strategy of operating "without constraints" and knowingly courting litigation risk rather than obtaining licenses, while simultaneously promoting its service for mass commercial exploitation in ways likely to mislead consumers about authorization and provenance.

278. Plaintiffs seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including orders that Udio shall:

a. Cease making or implying claims in Illinois (marketing, UI/UX, FAQs, ToS, partner integrations) that Udio outputs are "original," "royalty-free," "fully cleared," "commercial-ready," or otherwise free of third-party rights unless Udio (i) possesses, and (ii) clearly discloses the existence and scope of appropriate licenses.

b. Implement clear, prominent disclosures (pre- and post-generation) stating that Udio outputs may not be authorized, sponsored, or approved by any referenced artist/label/publisher and may implicate third-party rights.

c. Disable and/or effectively filter prompts and outputs within Illinois that are likely to cause confusion as to source, affiliation, sponsorship, or approval, including outputs that reproduce or emulate identifiable producer/artist "audio tags," distinctive voiceprints, or other source-identifying indicia (without written authorization from the identified person or rights-holder).

d. Add durable machine-readable provenance/watermarking to all outputs distributed into Illinois that (i) identifies Udio as the generative source

and (ii) states that the output is not an authentic recording by any human artist unless expressly authorized.

e. Provide corrective notices through Illinois-facing marketing channels and partner integrations clarifying that Udio outputs are not sourced from, endorsed by, or affiliated with specific artists or labels absent express disclosure.

f. Institute and publish a UDTPA compliance program (policies, training, human-in-the-loop review, and auditing) designed to prevent future confusion about source, sponsorship, affiliation, and authorization.

g. Pay Plaintiffs' costs and reasonable attorneys' fees pursuant to 815 ILCS 510/3 because Udio has willfully engaged in deceptive trade practices knowing them to be deceptive.

**Count XIV**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Unjust Enrichment Subclass*

279. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-121 as though fully set forth here.

280. This Count is brought on behalf of the Illinois Unjust Enrichment Subclass (the "Unjust Enrichment Subclass") and, to the extent Illinois law is applied on a classwide basis, on behalf of all Plaintiffs and Class members whose injuries occurred in Illinois. Plaintiffs plead this Count in the alternative to their legal claims pursuant to Fed. R. Civ. P. 8(d)(2)–(3).

281. Udio retained and continues to retain concrete benefits derived from Plaintiffs' and the Unjust Enrichment Subclass's works, identities, and market goodwill, including but not limited to:

a. avoided licensing fees and acquisition costs for audio and lyric datasets;

b. accelerated time-to-market and model quality improvements that drove user growth, enterprise integrations, and platform stickiness;

c. subscription revenues from paid tiers designed to scale output volume and commercial exploitation; and

d. capital raises and increased valuation (e.g., Udio's $10 million Seed) fueled by product capabilities built on unlicensed training data.

282. These retained benefits were obtained at Plaintiffs' and the Unjust Enrichment Subclass's expense: Udio's model quality and market expansion were built on unconsented copying/ingestion of recordings and lyrics and on the removal/obfuscation of CMI (authors, performers, publishers, ISRC/ISWC), which eliminated licensing opportunities, impaired attribution, and diluted catalog value.

283. Udio's enrichment is "unjust" because it is predicated on wrongful conduct beyond simple reproduction rights, including:

a. DMCA § 1202(b) CMI removal/alteration in Udio's "strip-and-slice" pipeline (conversion to raw formats, metadata stripping, segmentation), intentionally concealing sources and depriving rightsholders of attribution and licensing signals.

b. BIPA violations through collection, storage, and commercialization of Illinois artists' voiceprints and distinctive vocal identifiers without the informed written consent BIPA requires), a privacy-based extra element independent of any § 106 right.

c. IRPA violations through use of distinctive voices/identities for commercial purposes without consent, rights not preempted by the Copyright Act.

284. Independently and in the alternative, Udio's retention of benefits is unjust because Udio systematically leveraged Plaintiffs' and the Unjust Enrichment Subclass's creative outputs to flood the market with AI-generated tracks, displacing demand and licensing revenue that would otherwise accrue to rightsholders.

285. Udio's benefits are directly linked to the challenged misconduct: the more copyrighted/lyric content and biometric/identity data Udio ingested (while stripping CMI), the more "radio-quality" outputs it produced, which Udio monetized via subscriptions, enterprise integrations, and fundraising predicated on product capability and growth.

286. Equity will not permit Udio to retain the above benefits, acquired and maintained through the concealment of origin (CMI removal), exploitation of Illinois artists' voiceprints without consent (BIPA), and appropriation of identity (IRPA), without paying restitution to those whose works and identities supplied the value.

287. This Count is pled in the alternative and is expressly tethered to non-copyright wrongs (e.g., § 1202 CMI removal, BIPA, and IRPA). To the extent any aspect overlaps with rights equivalent to 17 U.S.C. § 106, Plaintiffs seek restitution only where an extra element renders the claim qualitatively different and not preempted.

288. To the extent legal remedies under the Copyright Act, DMCA, or BIPA are inadequate to disgorge Udio's full unjust gains (including valuation windfalls and enterprise synergies), equity requires restitution and ancillary relief.

289. Plaintiffs and the Unjust Enrichment Subclass seek:

a. Restitution of the value unjustly obtained, measured by (without limitation): (i) avoided licensing/acquisition costs for training sets; (ii) a fair share of subscription and enterprise revenues attributable to AI capabilities trained on Plaintiffs' works; (iii) unjust gains reflected in fundraising and post-money valuation increases causally tied to the challenged conduct; and (iv) the value of data assets/models derived from unlawfully obtained inputs.

b. Disgorgement of profits and an equitable accounting to trace, quantify, and return all benefits derived from the unlawful conduct, including ancillary partnership/integration consideration (e.g., product integrations that monetized model capabilities).

c. Imposition of a constructive trust over revenues and assets (including models, weights, datasets, and derivative products) unjustly

enriched by Plaintiffs' works and identities, pending accounting and restitution.

d. Injunctive relief preventing further retention or use of unjust gains and requiring corrective measures (including restoration/maintenance of CMI where feasible), without prejudice to broader injunctive relief sought elsewhere in the Complaint.

e. Pre- and post-judgment interest and such other equitable relief as the Court deems just.

**PRAYER FOR RELIEF**

290. Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Udio and award the following relief:

a. *Class certification*: Find that this action satisfies the requirements for maintenance as a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure, certifying the Classes and Subclasses defined herein, appointing Plaintiffs as representatives of the Classes, and appointing Plaintiffs' counsel as Class Counsel;

b. *Judgment*: Enter judgment in favor of Plaintiffs and all Class Members and against Defendant Udio on all counts;

c. *Injunctive Relief (Copyright Act)*: Grant a permanent injunction pursuant to 17 U.S.C. § 502 prohibiting Udio, its affiliates, subsidiaries, employees, agents, and all persons acting in concert or participation with it, from further copying, ingesting, reproducing, distributing, publicly performing,

creating derivative works from, or otherwise commercially exploiting Plaintiffs' and class members' copyrighted sound recordings without authorization;

d. *Injunctive Relief (DMCA)*: Grant a permanent injunction pursuant to 17 U.S.C. §1203 requiring Udio, its affiliates, subsidiaries, employees, agents, and all persons acting in concert or participation with it, to cease all intentional removal, alteration, or obscuring of Copyright Management Information (CMI), and where feasible, to restore or properly attribute all previously removed or altered CMI;

e. *Injunctive Relief (Illinois BIPA)*: Grant a permanent injunction pursuant to 740 ILCS § 14/20 of the Illinois Biometric Information Privacy Act requiring Udio to immediately delete all biometric identifiers and biometric information collected from Illinois subclass members, prohibiting any further collection, storage, use, or dissemination of such biometric data without informed written consent, and mandating full compliance with all applicable BIPA provisions moving forward;

f. *Statutory Damages—Sound Recordings (Registered)*: For each sound recording owned by Plaintiffs and/or the Copyright Class that is eligible for statutory damages pursuant to 17 U.S.C. §§ 412 and 504(c), award statutory damages, at Plaintiffs' election under § 504(c), in amounts to be determined by the jury, including up to $150,000 per infringed work for willful infringement under § 504(c)(2), and otherwise as permitted by § 504(c)(1).

g. *Statutory Damages (Lyrics)*: Award Plaintiffs and the Lyrics Copyright Subclass statutory damages pursuant to 17 U.S.C. § 504(c) for each

infringed musical-composition (lyric) registration — up to $150,000 per work for willful infringement (or up to $30,000 per work absent willfulness) — together with any enhanced damages, pre- and post-judgment interest, and such other relief the Court deems just and proper;

h. *Statutory Damages—Musical Compositions (Non-Lyric; Registered)*: For each registered musical-composition (non-lyric) work owned by Plaintiffs and/or the applicable Musical-Composition (Non-Lyric) Subclasses that is eligible for statutory damages pursuant to 17 U.S.C. §§ 412 and 504(c), award statutory damages, at Plaintiffs' election under § 504(c), in amounts to be determined by the jury, including up to $150,000 per infringed work for willful infringement under § 504(c)(2), and otherwise as permitted by § 504(c)(1).

i. *Statutory Damages (DMCA/CMI)*: Award Plaintiffs and other class members statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B) for each violation involving removal or alteration of CMI, in the maximum amount allowed by law;

j. Where statutory damages are available, Plaintiffs reserve the right, as permitted by law, to elect statutory damages or actual damages and profits on a work-by-work basis at any time before final judgment, subject to 17 U.S.C. § 412.

k. *DMCA § 1201 Injunction/Impoundment*: Permanent injunctive relief under 17 U.S.C. §1203 enjoining Udio from circumventing or trafficking in any technology, product, service, device, component, or part thereof that circumvents technological measures controlling access to, or protecting rights

in, Plaintiffs' and the Classes' works; impoundment and destruction of any such circumvention technologies and deletion of decrypted copies obtained via circumvention.

l. *Impoundment/Destruction (17 U.S.C. § 503)*: Order impoundment and destruction of (i) all infringing copies of Plaintiffs' works in Udio's possession, custody, or control, including in datasets, caches, or intermediary files; and (ii) any model parameters/weights and embeddings shown to be derived from Plaintiffs' works to the extent necessary to remedy ongoing infringement and prevent further harm.

m. *DMCA § 1201 Statutory Damages*: Statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) of not less than $200 and not more than $2,500 per act of circumvention, access, or trafficking in violation of § 1201, or, at Plaintiffs' election, actual damages and Udio's profits.

n. *Statutory Damages—DMCA § 1202 (CMI)*: At Plaintiffs' election before final judgment, award statutory damages for each violation of 17 U.S.C. § 1202 in the sum of not less than $2,500 and not more than $25,000, together with any additional relief provided by § 1203.

o. *Statutory Damages (Illinois BIPA)*: Award Plaintiffs and other class members statutory damages under the Illinois Biometric Information Privacy Act, 740 ILCS § 14/20, including $5,000 for each intentional or reckless violation, or alternatively $1,000 per negligent violation, in the maximum amount permitted by law, plus reasonable attorneys' fees, costs (including expert fees), and other relief including injunctive relief as appropriate;

p. *Actual Damages and Disgorgement (Previously Unregistered Copyrights)*: Award Plaintiffs and other class members with previously unregistered copyrights, including owners of unregistered musical-composition (lyrics) copyrights, actual damages, including disgorgement of all profits attributable to Udio's unauthorized exploitation of their works, as permitted under applicable federal law;

q. *Declaratory Relief (Copyright Infringement)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Udio's unauthorized copying, ingestion, training, and commercial exploitation of Plaintiffs' and class members' sound recordings constitute copyright infringement under the Copyright Act;

r. *Declaratory Relief (DMCA/CMI)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Udio's intentional removal, alteration, or obscuring of Plaintiffs' and class members' CMI violates 17 U.S.C. § 1202(b) (removal/alteration of CMI) and § 1202(a) (false CMI);

s. *Declaratory Relief (Illinois BIPA)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Udio's collection, use, storage, and dissemination of Illinois subclass members' biometric identifiers and biometric information violates the Illinois Biometric Information Privacy Act, 740 ILCS § 14/1 et seq.;

t. *IRPA Injunctive Relief*: Enter a permanent injunction under 765 ILCS 1075/40 enjoining Udio from using Plaintiffs' and IRPA Subclass members' identities, including their names, voices, signatures, photographs,

images, likenesses, and any simulated or synthesized versions thereof, for any commercial purpose without prior written consent; and requiring deletion of models, datasets, and embeddings encoding such identities.

u. *IRPA Damages and Profits*: Award actual damages, Udio's profits attributable to the unauthorized uses, punitive damages, costs, and reasonable attorneys' fees as allowed by 765 ILCS 1075/40–/55.

v. *Injunctive Relief (UDTPA)*: Grant preliminary and permanent injunctive relief under 815 ILCS 510/3 as pleaded in the UDTPA count, including corrective advertising/disclosures, prompt/output filters to prevent source confusion, provenance labeling, Illinois-facing integration changes, a UDTPA compliance program, and an award of costs and reasonable attorneys' fees for willful violations.

w. *Unjust Enrichment (Illinois)*: Award restitution and disgorgement of benefits unjustly retained, and impose a constructive trust as necessary to prevent unjust enrichment under Illinois law.

x. *Impoundment and Destruction, 17 U.S.C. § 503; DMCA § 1203(b)*: Order the impoundment of all infringing copies and any devices or products involved in violations, and upon final judgment, the destruction or other reasonable disposition of (i) all copies/phonorecords and all articles by which such copies or phonorecords may be reproduced, and (ii) any device or product involved in DMCA violations; including datasets, caches, shards, training checkpoints and, to the extent necessary to abate ongoing infringement, model

parameters/weights and embeddings derived from Plaintiffs' works, or remedial modification sufficient to prevent further use of infringing material.

y. *Accounting and Disgorgement*: Order an accounting of Defendants' revenues and profits attributable to the infringements and DMCA violations, and disgorgement of such profits.

z. *Attorneys' Fees and Costs*: Award Plaintiffs their reasonable attorneys' fees and costs under 17 U.S.C. § 505 (copyright), 17 U.S.C. § 1203(b)(4)–(5) (DMCA), 740 ILCS 14/20(3) (BIPA), and 765 ILCS 1075/55 (IRPA), and as otherwise permitted by law.

aa. *Pre- and Post-Judgment Interest*: Award pre- and post-judgment interest to the maximum extent permitted by law;

bb. *Additional Relief*: Grant any other further legal or equitable relief the Court deems just, equitable, and proper, including, where appropriate, constructive trust, accounting, or other equitable remedies.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: January 8, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs David Woulard, Attack the Sound LLC, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell.*